LEISURETIME RECREATION CENTER VI, INC., Petitioner-Appellee, *v.* JANE M. BYRNE, Mayor and Local License Commissioner of the City of Chicago, Respondent-Appellant.

First District (2nd Division)    No. 79-1851

Opinion filed February 10, 1981.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Mary K. Rochford, Assistant Corporation Counsel, of counsel), for appellant.

Jann, Carroll, Kruse, Sain & Dolin, Ltd., of Chicago (David A. Epstein and Gerald P. Kenney, of counsel), for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This court has been asked to review the trial court's issuance of a writ of *mandamus* against the mayor of Chicago in her capacity as local licensing commissioner. Petitioner, Leisuretime Recreation Center, sought

the writ to compel defendant mayor to issue a license to Leisuretime to operate an arcade on Western Avenue in Chicago. Petitioner contends that it had expended considerable sums in reliance upon the impending issuance of the license and that the mayor should be estopped to deny her approval of Leisuretime's application. The mayor maintains that during the entire time when petitioner's expenditures were being made there existed in the city of Chicago an ordinance prohibiting the operation of an arcade in the location proposed by petitioner. She thus denies that petitioner established a clear right to the issuance of the writ of *mandamus*.

On September 7, 1979, Leisuretime filed a petition in the circuit court of Cook County for a writ of *mandamus*. Petitioner alleged that it had applied on December 18, 1978, for a "Public Place of Amusement—Class II—Arcade" license as provided for in chapter 104.2 of the Municipal Code of Chicago. Prior to the time petitioner applied for its arcade license, the amended ordinance had been referred to the City Council and was thus under consideration for passage, to limit arcades within 1000 feet of residential areas; the ordinance passed made it 200 feet. (The original formulation was as a zoning ordinance; as passed, however, it was designated a licensing ordinance.) The petition set out the steps which Leisuretime had undertaken in reliance upon the eventual issuance of the license. Petitioner maintained that it had fulfilled all requirements of chapter 104.2 and therefore was entitled to a writ of *mandamus* compelling the mayor to grant the license.

At the first hearing on the petition, the city denied that Leisuretime had a clear right to the writ, stating that "the zoning law of the city of Chicago was changed, and that change would prohibit the use of an arcade in that zoning district where the premises are located." The court, however, indicated that it was aware of cases on estoppel against a municipality and suggested that the instant case might fall within that exception. Before ruling, the court announced that it needed to hear evidence on the extent of reliance.

At the ensuing evidentiary hearing, the parties stipulated to the following facts. On December 16, 1978, petitioner applied for a Class II arcade license for proposed operation at 3641-43 North Western Avenue. At that same time, the zoning department approved Leisuretime's application on the basis that an arcade was a permitted use in the zoning area (C2—2) of which 3641-43 North Western Avenue was a part. On January 22, 1979, the police department, following an investigation of the individuals involved in the Leisuretime Corporation, approved the application. On February 15 the building department issued a permit to E&S Construction to remodel the premises on Western Avenue to accommo-

date an arcade. On March 23 the building department inspected the premises and approved the application. Finally, on March 30, the fire department inspected the premises and issued its approval.

Following the presentation of the above stipulated facts, petitioner called Earl Malisoff, the secretary/treasurer of Leisuretime to the stand. He testified that he had tendered $500 and an application for an arcade license. The officers of the corporation determined that it would be necessary to remodel the Western Avenue location because it had previously been maintained as a flower shop. Petitioner employed a general contractor, E&S Construction Company, who submitted plans to the building department. After the plans were submitted, the permit was issued; remodeling proceeded and was eventually approved by the various city inspectors. The witness detailed expenditures of approximately $21,300. He also testified that if the building permit had not been issued, he would not have made the expenditures. On cross-examination, Malisoff was questioned about the contingency arrangement under which the Western Avenue location was leased. He stated that Leisuretime had entered into a five-year lease with a 30-day contingency escape clause which would allow Leisuretime to secure approval from the zoning and police departments prior to being bound by the lease. If that approval were not forthcoming, Leisuretime had the right to cancel the lease and all advanced funds would be refunded. The lease was dated December 17, 1978. Counsel for the city pointed out that the approval by the police department did not occur until January 22, more than 30 days after the lease was executed. Malisoff admitted that Leisuretime had not exercised its right to cancel even though it could have on the 30th day. Leisuretime instead allowed itself to be bound by the five year lease prior to the approval by the police department.

The witness then testified that in the early part of April 1979, he went to a meeting at the office of the license officer for the city of Chicago, Sergeant Gavin. Sergeant Gavin showed him a copy of an ordinance that had been passed by the city of Chicago on January 19, 1979. The ordinance read that an arcade could not be maintained within 200 feet of a residential zone. Sergeant Gavin also informed him that Leisuretime would not receive a license because the location on Western Avenue was within 200 feet of a residential area. Malisoff conceded that the remodeled building could be used for a business other than an arcade.

Following this testimony, the trial court reviewed the ordinance in question:

"104.2—9.1. No person shall operate any arcade in any place within two hundred feet of any church, hospital, building operated * * * as a grammar or secondary school, or residential zoning

district, unless such place is licensed as an arcade before the establishment of the church, hospital, educational institution, or zoning district." (Chicago, Ill., Council Jour. 9538 (Jan. 19, 1979).)

Section 2 of the ordinance of January 19, 1979, provides:

"This ordinance shall be in full force and effect from and after its passage." (Chicago, Ill., Council Jour. 9538 (Jan. 19, 1979).)

The trial court first questioned the constitutionality of the ordinance. It then ruled that since petitioner had been issued a building permit and had spent monies in reliance upon that permit, petitioner fell within the case law exception estopping the city from denying the arcade license. The court also stated:

"I recognize the right of the City Council to rezone property; but when they do it, I don't think they can do it in violation of people's rights to rely on the ordinance."

From the trial court's order issuing a writ of *mandamus* against the city of Chicago and its licensing official, the mayor, this appeal was taken.

The General Assembly of Illinois has selected certain occupations and enterprises to subject to regulation by local municipalities. Arcades or purveyors of pinball machines are operations which may be regulated, governed or even banned by municipal ordinance. See Ill. Rev. Stat. 1979, ch. 24, pars. 11—42—1, 11—42—2; see generally *Metropolis Theater Co. v. City of Chicago* (1910), 246 Ill. 20, 23, 92 N.E. 597, *aff'd* (1913), 228 U.S. 61, 57 L. Ed. 2d 730.

Chapter 101 of the Chicago Municipal Code contains the general provisions which govern licensed operations in the city. The first section states: "It shall be unlawful for any person to conduct, engage in, maintain, operate, carry on, or manage a business or occupation for which a license is required by any provision of this code without a license *first* having been procured." (Emphasis added.) (Chicago, Ill., Mun. Code §101—1 (1975).) Section 2 of this chapter gives notice to applying parties that, "In all cases where licenses are required to be procured, such license shall be granted by the mayor and attested by the city clerk, except where provision is expressly made for the granting of licenses by some other officer of the city." Chicago, Ill., Mun. Code §101—2 (1975).

The procedure for the mayor's issuance of an arcade license is contained in section 101—5 of the municipal code: "Upon receiving notification * * * that the applicant * * * has complied with all of the necessary licensing requirements for the particular license as set forth in the Sections of the Municipal Code governing the particular license, and that all laws and provisions of this Code regulating the business * * * have been complied with, the Mayor shall authorize the issuance of said license by the City Clerk." (Chicago, Ill., Council Jour. 7592 (April 21,

1978), amending §101—5 of the Chicago Municipal Code.) Thus, although tender of a complying application obliges issuance of a license, one who applies for an arcade license is on notice that the mayor of Chicago has sole authority to grant the license. The absence of mayoral discretion in the granting of a license is relevant to the degree of certainty which an applicant can maintain prior to the actual issuance of the license.

The third section contained in the general licensing provisions states: "All licenses shall be subject to the provisions of this code which may be in force at the time of the issuance thereof or which may subsequently be passed by the city council." (Chicago, Ill., Mun. Code §101—3 (1975).) It is the clear intent of this provision to inform parties applying for and holding licenses under this chapter that they must keep abreast of current licensing provisions, whether or not in effect at the time of application. Petitioner, however, contends that the city is estopped to enforce the amended ordinance to deny Leisuretime a license.

■■ It is well established that it is a legitimate exercise of the police power for a municipality to prohibit certain regulated amusements within specified distances of churches, schools, or residential areas. (See *Nahser v. City of Chicago* (1915), 271 Ill. 288, 291, 111 N.E. 119; see generally *Hagen v. City of Rock Island* (1959), 18 Ill. 2d 174, 181, 163 N.E.2d 495.) *Mandamus* will not ordinarily issue to relieve a party of the consequences of his own mistakes or to interfere with the rights of third parties (here the inhabitants of nearby residential areas). (See *Repp v. Becker* (1925), 238 Ill. App. 64, 71-72; see generally *People ex rel. American National Bank & Trust Co. v. Smith* (1969), 110 Ill. App. 2d 354, 249 N.E.2d 232.) Where, however, a question of estoppel is presented, the acts of the city officials may have been sufficient inducement for Leisuretime to change its position in reliance thereon and to warrant the trial court's issuance of a writ of *mandamus. Cf. Wilke v. City of Ballinger* (Tex. Civ. App. (1930), 31 S.W.2d 1102, 1103 (absent question of estoppel, officer of municipal corporation cannot bind principal); but *cf. Kramer v. City of Chicago* (1978), 58 Ill. App. 3d 592, 597, 374 N.E.2d 932 (issuance of permit not sufficient inducement where contrary ordinance existed); see also *J. Burton Co. v. City of Chicago* (1908), 236 Ill. 383, 390, 86 N.E. 93 (permit must be issued by one with authority to convey rights under it).

■■ There is no vested right in the continuation of a law or ordinance (see *People ex rel. Eitel v. Lindheimer* (1939), 371 Ill. 367, 373, 21 N.E.2d 318, *appeal dismissed* (1939), 308 U.S. 505, 84 L. Ed. 432, 60 S. Ct. 111), but where a litigant has made a substantial change in position, and has made expenditures or incurred obligations in accord with a building permit, the building permit may ripen into a vested right. (*Deer Park Civic Association v. City of Chicago* (1952), 347 Ill. App. 346, 351, 106 N.E.2d 823; see

also *Cities Service Oil Co. v. City of Des Plaines* (1961), 21 Ill. 2d 157, 162-63, 171 N.E.2d 605; *People ex rel. Pielet Brothers v. Village of McCook* (1954), 3 Ill. App. 2d 543, 548-49, 123 N.E.2d 142.) The question of change in position and the corresponding invocation of the doctrine of estoppel *in pais* is one for the courts to decide on the basis of the totality of the circumstances of the case, as right and justice may require. (See *Wehrmeister v. Carlman* (1958), 17 Ill. App. 2d 171, 180, 149 N.E.2d 453, citing *Melin v. Community Consolidated School District No. 76* (1924), 312 Ill. 376, 383-84, 144 N.E. 13.) Where petitioner has acted in good faith reliance on the affirmative acts of city officials and has made expensive improvements, it would be highly inequitable to render them useless after the fact. (See *Hurt v. Hejhal* (1930), 259 Ill. App. 221, 228.) The granting of a writ of *mandamus* is a matter resting within the discretion of the trial court (*McRell v. Jackson* (1977), 49 Ill. App. 3d 86, 89, 363 N.E.2d 940), and although not a writ of right, it should be awarded only in accord with the exercise of sound judicial discretion and when merited by established legal principles. (*People ex rel. Hamer v. Jones* (1968), 39 Ill. 2d 360, 368, 235 N.E.2d 589.) In the proper case, estoppel *in pais* can work to justify the issuance of a writ of *mandamus*. Compare *People ex rel. Beardsley v. City of Rock Island* (1905), 215 Ill. 488, 495, 74 N.E. 437, with *People ex rel. Shell Oil Co. v. Town of Cicero* (1973), 11 Ill. App. 3d 900, 906, 298 N.E.2d 9, and *People ex rel. Citizens Bank & Trust Co. v. Ward* (1963), 39 Ill. App. 2d 20, 187 N.E.2d 533 (abstract), and *Sinclair Refining Co. v. City of Chicago* (1927), 246 Ill. App. 152, 163-65.

■■ The instant case is similar to an early licensing case, *People ex rel. Deddo v. Thompson* (1918), 209 Ill. App. 570, wherein the city of Chicago was held estopped to deny a license for maintenance of a garage even though there was a restrictive distance ordinance which would bar the operation of a garage in the location selected. The court found that the action of the city council in passing an order directing its commissioner of buildings to issue a permit to the petitioner to locate a garage on the selected site was sufficient inducement to merit expenditures in reliance thereon. This "unquestioned affirmative act by the municipal corporation or its officers inducing a change of position and consequent injury that otherwise would not have resulted" provided a sufficient basis to warrant the issuance of a writ of *mandamus* to order the city to provide petitioner with a license to operate a garage. (209 Ill. App. 570, 575.) The facts of the instant case are markedly similar and provide a reasoned basis for the decision of the trial court in the case at bar. (But see *People ex rel. Satas v. City of Chicago* (1972), 5 Ill. App. 3d 109, 113, 282 N.E.2d 739; *cf. Smith v. Ballas* (1948), 335 Ill. App. 418, 421-22, 82 N.E.2d 181 (strict construction of distance ordinance in accord with legislative intent to prevent unwholesome influence of tavern on nearby areas).) The petitioner's

reliance was established in the trial court, and there was apparently no question that petitioner qualified for the license absent the distance ordinance. Thus the granting of the writ of *mandamus* to order the city to issue an arcade license is affirmed.

Affirmed.

HARTMAN, P. J., and PERLIN, J., concur.