SECOND DIVISION

August 21, 2001

No. 1-00-1585

FIRST AMERICAN DISCOUNT      
 ) Appeal from the

CORPORATION,     ) Circuit Court of 

) Cook County.   

Plaintiff-Appellant, )

)

v. ) Case No. 97M1002750

)

)

GEORGE JACOBS and DEENA JACOBS, ) The Honorable

) Glynn J. Elliott, Jr.,

Defendants-Appellees. ) Judge Presiding. 

JUSTICE GORDON delivered the opinion of the court:

The central incident in this appeal is plaintiff-appellant First American Discount Corporation's (FADC) liquidation of defendants George and Deena Jacobs' trading account, allegedly without notice, on October 27, 1997.  Defendants claimed that this liquidation constituted unauthorized trading, and the Cook County Circuit Court agreed, finding that FADC carried out unauthorized trading and thereby breached its fiduciary duty to defendants.  Following a bench trial, the court entered judgment in the amount of $106,511.74 (essentially the amount of defendants' equity balance plus securities on deposit prior to the liquidation) against FADC and in favor of defendants.  

FADC is a registered futures commission merchant (FCM) located in Chicago, with customers whose trades are cleared at the Chicago Mercantile Exchange (CME).  Among FADC's customers were defendants, whose account was introduced to FADC by Kristian 

1-00-1585

Capital Management, Inc. (KCM), of Naples, Florida, a registered introducing broker (IB).  Defendants, also of Naples, Florida, opened a trading account with FADC in January 1997 and executed a Customer Agreement with FADC.  One of the agreement's provisions authorized FADC to liquidate the positions in defendants' accounts "without prior demand or notice."  

On the morning of October 27, 1997, defendants held what are called strangle option positions in the December Standard & Poor's (S&P) 500 futures contract traded on the CME.  They had sold 10 November 1025 calls and 10 November 890 puts.  These options gave the purchasers the right, but not the obligation, to buy or sell the underlying S&P contract at a fixed price within a specified time.  Specifically, a put option is an option sold to a buyer giving him the right to sell the contract at the fixed, strike price even if the market declines below that price, while a call option is an option sold to a buyer giving him the right to buy at the strike price even if the market rises above that level.  In this case, the 10 November 1025 call options sold by defendants gave the purchasers the right to purchase the contract at the strike price of 1025, even if the price rose above that level, and the 10 November 890 put options gave the purchasers the right to sell the contract at the strike price of 890, even if the price fell below that level.  Thus a "ceiling" of 1025 and a "floor" of 890 were created.  

In engaging in this strategy, defendants were betting that 

1-00-1585

the underlying S&P contract price would stay within the range between this ceiling and floor until the options expired, which would mean they would expire worthless.  So long as the underlying contract price remained below 1025, the purchaser of the call option had no incentive to exercise it and purchase the contract at the higher strike price of 1025.  Similarly, if the contract price remained above 890, the purchaser of the put option had no incentive to exercise it and sell at the lower, 890 strike price.  If the options expired worthless, defendants would be able to keep the entire amount (premium) which they had collected when they sold the options.  However, defendants' positions were vulnerable to unlimited risk should the underlying market move through either the ceiling or the floor.  

Trading customers such as defendants are required to keep on deposit with their FCM, in this case FACD, a certain amount of what is called margin, which is a good faith deposit that generally represents from 3 to 7 percent of the underlying contract value. When this margin dwindles and the customer's account goes "under margin," the FCM generally issues a "margin call" requiring the customer to deposit additional money to bring the margin back up to the required level.  According to documents introduced into evidence at trial, at the close of trading on Friday, October 24, 1997 (the last day of trading before Monday, October 27, 1997), defendants had total equity of $57,164.98 in their trading account, plus T-bills with a market value of 

1-00-1585

$48,846.76, for a sum of $106,011.74.  The initial margin requirement for the positions held by defendants was $94,776, which meant that they had on hand an excess margin of $11,235.74.

So long as the positions in their account did not lose more than 

$11,235.74 in value, the account had sufficient equity to maintain the positions.  

It is undisputed that the stock market fell precipitously on October 27, 1997, which the testimony disclosed was the date of the worst single-day point drop in the history of the U.S. stock market.  See 
Great Northern Ry. Co. v. Weeks
, 297 U.S. 135, 149 (1936) (taking judicial notice of the stock market collapse of 1929).  As a result of this decline, defendants' account became under-margined.  Plaintiff asserts, without contradiction, that at the time it liquidated defendants' positions, the account had a deficit balance of $27,631, 
i.e.
, all of the margin had been depleted, and the account balance had dropped an additional $27,631, an amount which plaintiff FACD paid to the CME at the close of business on October 27.  It is also undisputed that earlier in the day, before defendants' account became under-margined, defendant George Jacobs instructed KCM, his introducing broker, to execute a series of roll-down orders which would result in a lowering of both the "ceiling" and the "floor" of his positions.  According to this "roll-down" strategy, which was only partially completed prior to the liquidation, defendants would gradually buy back the 890 puts and 1025 calls, and replace 

1-00-1585

them by selling the same number of 885 puts and 985 calls.  Thus the "floor" would be lowered from 890 to 885, and the "ceiling" would be lowered from 1025 to 985.  

In November 1997 FADC filed suit against defendants George and Deena Jacobs, seeking a judgment against them in the amount of $27,631.38.  FADC alleged that under the terms of the Customer Agreement entered into between defendants and FADC, defendants agreed to pay any and all debit balances incurred in their trading account.  According to the complaint, defendants' account incurred a debit balance of $27,631.38 "[a]s a result of unprofitable trades initiated by Defendants," and defendants had failed and refused to pay this amount to FADC.  Thus FADC alleged that defendants breached the agreement.  

Defendants counterclaimed that plaintiff's liquidation of their positions constituted unauthorized trading, and that this liquidation was a breach of plaintiff's fiduciary duty to defendants.  Plaintiff moved for summary judgment, contending that it had both a legal and a contractual right to liquidate defendants' under-margined positions with or without notice.  Attached to defendants' response to this motion was an affidavit of defendant George Jacobs.  In this affidavit, Jacobs stated that prior to opening his account with FADC, he had spoken with Ken Kristian of KCM, the Florida broker which introduced defendants' account to FADC.  According to Jacobs, Ken Kristian told him at that time that FADC would never liquidate positions 

1-00-1585

in Jacobs' account unless he failed to meet a margin call.  

The trial court denied plaintiff's motion for summary judgment.  A bench trial began on June 4, 1999, and it was reconvened on October 14, 1999.  The following relevant evidence was presented at trial.  

Carl Gilmore, the director of compliance for FADC, was called by both FADC and defendants.  Gilmore stated that on October 27, 1997, he noticed a dramatic downward move in the S&P 500 futures market.  When the market declined to about 930, Gilmore became concerned about defendants' account, whose positions, as noted, had a "floor" of 890.  Gilmore called his firm's trading desk and asked them to contact KCM and express Gilmore's concerns about defendants' positions if the market continued to decline.  He told the trading desk to ask KCM what defendants' intentions were if the market continued to drop.  Gilmore was told by the trading desk that defendants were unable to wire funds on that day because they were traveling.  The trading desk informed Gilmore that defendants wanted to initiate a "roll-down" strategy which would lower the floor and ceiling of their positions, thereby reducing the potential margin consequences to the account. It was Gilmore's understanding that the roll-down strategy was to be initiated when the underlying futures contract price hit 910.   

Gilmore further stated that he told the trading desk the roll-down strategy was acceptable for the time being, but that if 

1-00-1585

the market continued to decline, the positions would have to be liquidated, since additional funds apparently were not forthcoming from defendants.  Gilmore told the trading desk to inform KCM about the possible liquidation.  

Gilmore testified that they began to implement the roll-down strategy but were unable to complete it.  The market declined rapidly, moving through the new floor, and FADC was forced to liquidate defendants' positions in an effort to reduce the risk and protect itself.  At the time of liquidation, defendants' account showed a deficit balance of $27,631, which FADC was required to pay to the CME at the close of business on October 27.  According to Gilmore, this deficit amount would have been much greater had FADC not acted when it did.  If FADC had simply continued the roll-down, the deficit in defendants' account would have grown by another $54,850 prior to settlement, leaving a deficit in excess of $80,000 at the end of the day.  At the opening the next day, this deficit would have increased not by $55,000 but instead by $177,050.  Thus the actual deficit of $27,631 would have grown to a total of some $204,000.  In that event, defendants' margin call at the opening on October 28, 1997, would have exceeded $255,000.

During his testimony, Gilmore referred to an individual information form which was included in the Customer Agreement between defendants and FADC.  According to this form, which as part of the agreement was admitted into evidence, George Jacobs 

1-00-1585

listed his residence as Naples, Florida.  The residence telephone number listed on the form had a Florida area code.  On October 27, 1997, based on conversations between FADC and KCM, FADC knew that Jacobs was "on the road."  Gilmore stated that since he could not have reached Jacobs at the Florida telephone number on October 27
th
, he did not call Jacobs at that number and give him a margin call. According to Gilmore, Jacobs never gave him a number where he could be reached on that day.

Defendant George Jacobs, who also was called by FADC and defendants, testified that on October 27, 1997, he was traveling somewhere in Maryland (apparently en route from his home in Connecticut to his home in Florida) when he heard on the car radio that the market had moved down ("toward [his] put positions from the start of the day").  He went to the nearest telephone and called KCM.  Jacobs talked to Kirk Kristian (Ken Kristian's brother), a KCM broker, about the market.  Kirk Kristian told Jacobs that FADC was concerned about the market, and Jacobs asked Kirk if he, Jacobs, needed to send any additional money.  Kirk said he would find out.  Also at this time, Jacobs instructed Kirk Kristian to begin a roll-down strategy if the market fell to 910.  Jacobs testified that he did not have a cell phone, and he could not be sure that he would come to another pay telephone before 15 or 20 miles had passed. He wanted to prepare himself in case the market dropped, which is why he told Kirk to institute the roll-down strategy.  According to Jacobs, there was no 

1-00-1585

discussion at this time about a margin call.

Jacobs stated further that he called Kirk Kristian a short while later, and Kirk told him that FADC would not tell him (Kirk) that Jacobs "need[ed to send] any money."  Jacobs called Kirk a third time and asked him if there was a problem with the margin, and Kirk told him that FADC would not tell him.  When Jacobs called Kirk a fourth time,
(footnote: 1) Kirk told him that FADC had liquidated his positions.   

Jacobs maintained throughout his testimony that he never received a margin call from FADC.  He also insisted that he never told Kirk Kristian on October 27, 1997, that he would not meet a margin call, or that he would not wire money.  Jacobs testified that he had $103,000 in his bank account which he could have wired.  There were 32 branches of this bank in Maryland, and Jacobs stated that he was prepared to go to the closest one and "see what arrangements [he] could make."  He never did that because, according to Jacobs, he was never asked to put up any additional money.  Jacobs also stated that the market subsequently recovered and that by the end of the next day (October 28), the November 890 and 885 S&P options "were very close to the *** positions that we had [previously]." 

1-00-1585

Jacobs conceded that, since his account was liquidated at a deficit on October 27
th
, at some point on that day it was under-margined.  He also conceded that at the point when his account became under-margined, FADC could not have reached him at his residence in Florida.  Jacobs did not have a cell phone, and he did not give Kirk Kristian a number where he could be reached.  He also acknowledged that he signed the Customer Agreement with FADC, and that by signing it he represented to FADC that he had read and understood its terms, and agreed to be bound by them.  Jacobs said he believed that Ken Kristian of KCM had orally amended the agreement.  Jacobs attempted to testify, as indicated in his earlier affidavit attached to his response to FADC's summary judgment motion, that he had been assured by Ken Kristian that he would always receive a margin call prior to any liquidation.  However, the trial court sustained FADC's objection that this testimony was barred by the parol evidence rule.  Jacobs conceded that no one from FADC ever told him that Ken Kristian worked for FADC or that he had the authority to amend the agreement, which was between FADC and defendants.  

Kirk Kristian, a commodities broker with KCM, testified on behalf of FADC.  He said Jacobs was a client of his brother, Ken Kristian, but that Ken was out of the office on October 27.  Kirk Kristian stated that his first conversation with Jacobs on that day was at 1:17 p.m. eastern time.  Jacobs told Kirk that he was traveling south to Naples, Florida, for the winter and that he 

1-00-1585

had heard on the radio that the market was falling and he was very concerned.  Kirk explained to Jacobs what FADC's concerns were.  He told Jacobs that FADC wanted to know if he had money available should the market continue to move downward.  Kirk and Jacobs discussed implementing a roll-down strategy if the market continued to decline, and Kirk told Jacobs that he would present that option to FADC.  However, he asked Jacobs if money was available in case the roll-down strategy proved insufficient.  According to Kirk Kristian, Jacobs was confident that the market would not move much further downward, and he (Jacobs) was not in a position to wire money. Jacobs told Kirk that his bank was in Connecticut and that he was not going to send money.  

Kirk Kristian testified further that FADC called him on October 27, 1997, and expressed concern about defendants' positions.  FADC was concerned that if the market continued to fall, Jacobs might be on margin call or he could possibly "go debit."  FADC asked Kirk Kristian what funds Jacobs had available in case they were needed.  After talking to Jacobs, Kirk told FADC about the roll-down strategy and that it was unlikely that Jacobs would be sending money.  FADC told Kirk that they could do the roll-down but that if the market continued lower, that might not be enough.  FADC told Kirk to tell Jacobs that if he was unable to wire funds or if the roll-down position became under-margined, his positions could be liquidated.  Kirk relayed this information to Jacobs the next time Jacobs called him, which was 

1-00-1585

at about 1:47 p.m. eastern time. 

Kirk Kristian also testified that the market continued to decline, and when it reached 910, the roll-down sequence was initiated.  However, the market continued downward and traded through the new "floor" of 885.  FADC then called Kirk to say that they were liquidating Jacobs' "put" positions (the "floor" positions) because Jacobs was in deficit at that point.  Kirk was not able to call Jacobs and give him this information because Jacobs was on the road, traveling from town to town, and was not at a telephone booth.  He did not have a cell phone.  Jacobs' "call" positions (the "ceiling" positions) subsequently were liquidated as well.  

Linda Frazier testified as an expert witness on behalf of defendants.  She stated that, according to custom and practice in the industry, as well as under CME and Commodity Futures Trading Commission (CFTC) rules, a customer is entitled to notice that his account positions are at risk of being liquidated, and is entitled to an opportunity to meet the margin call in order to prevent liquidation.  Frazier averred that failure to issue a margin call prior to liquidating an account is a violation of CME rules pertaining to liquidation of accounts.  According to Frazier, even if the broker knew that the customer was not at his residence in Florida but was instead traveling by car from Connecticut to Florida, the broker still must attempt to call the customer at his Florida residence.   

1-00-1585

On April 17, 2000, the trial court entered a judgment order finding that FADC "did unauthorized trading and did break [sic] its fiduciary duty to George & Deena Jacobs."  The court awarded defendants $106,511.74 in damages.  The court also rejected defendants' contention that KCM was an agent of FADC.  The instant appeal followed.  

DISCUSSION

FADC urges on appeal that it had a legal and contractual right to liquidate defendants' under-margined positions even without prior notice.  Thus FADC contends that the trial court erred in finding for defendants on their counterclaim that this liquidation constituted unauthorized trading and a breach of fiduciary duty.  FADC also asserts that it was entitled to judgment in its favor on its affirmative complaint for breach of contract against defendants. 

The question which must be determined in this decision is whether plaintiff FADC, the brokerage firm, was entitled to liquidate defendants' positions without a prior margin call at a time when defendants were inaccessible.  Our conclusion is that the brokerage firm was so entitled as a matter of law.  While there are no cases specifically on point from our jurisdiction, there is a decision from the Supreme Court of North Carolina (see 
Moss v. J.C. Bradford & Co.
, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶26,146 (1994)), as well as an administrative law decision from the CFTC (see 
Mohammed v. Jack Carl/312 

1-00-1585

Futures, Index Futures Group, Inc.
, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶25,229 (1992)), which clearly uphold the right of a brokerage house to effect a liquidation of an under-margined account without prior notice.  

In 
Moss v. J.C. Bradford & Co.
, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶26,146 (1994), which is nearly exactly on point, the plaintiffs, who were trading customers of the defendant brokerage firm, alleged that the defendant wrongfully liquidated their accounts on the CME and thereby breached the agreement they had entered into with the defendant.  This liquidation followed a precipitous drop in the S&P 500 index on Monday, October 19, 1987, which resulted in a loss to the plaintiffs of $282,625.  The defendant broker issued a margin call, and the plaintiffs' representative attempted to meet it with "over the counter" stock which, under CME rules, could not be used to satisfy a margin call.  Accordingly, the stock was used as security for a loan from the brokerage firm to the plaintiffs, and it was this loan rather than the stock which was used to meet the margin call.  

The market continued to spiral downward, and by the next morning, an additional margin call of $105,000 was issued.  The plaintiffs were able to come up with only $65,000, so the defendant sold $40,000 worth of the plaintiffs' over-the-counter stock to satisfy the remainder of the margin call.  Meanwhile, the market continued to plummet, and the defendant determined 

1-00-1585

that another margin call would be necessary when the index fell to 191.5.  The defendant therefore decided to enter a "stop loss order" for the plaintiffs' contracts at an index of 190, which meant that if the index fell to 190, the plaintiffs' accounts would be liquidated.  The defendant attempted to contact the plaintiffs' representative to inform him of the decision, but was unable to reach him.  Shortly thereafter the index reached 190, and the plaintiffs' accounts were liquidated. 

The customer agreement at issue in 
Moss
 was similar to the agreement in the instant case.  Under its terms, if the plaintiffs' accounts became under-margined, the defendant was authorized to liquidate them without notice. The defendant thus argued that the agreement gave it the right to liquidate the plaintiffs' accounts "whenever it deemed itself at risk and without issuing a margin call or providing the plaintiffs with notice of its intent to liquidate their positions."  
Moss
, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,802.  The court in 
Moss
 did not reach this question, however, concluding instead that the federal regulatory scheme governing margin calls and account liquidation permitted the liquidation of a customer's account without prior demand or notice.  According to the court, "any [contract] terms contrary to the federal regulatory scheme in the area of futures trading would be unenforceable."  
Moss
, 
[1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,805.  

Thus if the contract in 
Moss
 were construed to require such 

1-00-1585

notice, it would be in violation of the federal scheme.  "Since the federal regulatory scheme is designed to afford merchants and commodities exchanges with maximum protection, any terms of the customer agreement which exposed [the defendant brokerage firm] (and thereby the CME) to a risk greater than that allowed by federal law would be unenforceable."  
Moss
, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,805.  

In discussing this regulatory scheme, the court pointed in particular to CFTC regulation 1.55 (17 C.F.R. §1.55 (1999)), which prescribes the "Risk Disclosure Statement" that futures merchants must provide to their customers, and to CME Rule 827 (since replaced by portions of CME Rule 930).  Both Rules 1.55 and 827 (and CME Rule 930) deal with margin and liquidation.  The court concluded that "the pervasive federal regulatory paradigm in the area of futures trading, including CME Rule 827, is designed to afford maximum protection to the commodities merchants and the commodities exchanges themselves and therefore 
permits the liquidation of a customer's under-margined account without prior demand or notice
."  (Emphasis added.)  
Moss
, 
[1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,804-05.  The court explained that "it is imperative that futures merchants be able to act quickly and decisively to liquidate a customer's account when, as in the present case, a precipitously declining market demands such action."  
Moss
, 
[1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,804. Therefore "the federal 

1-00-1585

scheme, including Rule 827, contemplates and permits 
but does not require
 a demand, i.e., margin call, or notice prior to liquidating a customer's account."  (Emphasis in original.)  
Moss
, 
[1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,804. 

This same conclusion was reached in an administrative decision of the CFTC, which is the federal agency charged with regulation of commodity futures trading.  In 
Mohammed v. Jack Carl/312 Futures, Index Futures Group, Inc.
, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶25,229 (1992), 
the complainants alleged that the respondent FCM had liquidated positions on their account without giving them an opportunity to meet a margin call, and that this constituted unauthorized trading. As in 
Moss
 and the instant case, the complainants had signed customer agreements acknowledging that the FCM could liquidate positions without notice or demand if the account was under-margined.  The evidence presented at trial showed that the complainants' account was under-margined for a week and that during this time the respondent tried repeatedly to contact them but to no avail.  The CFTC Administrative Law Judge (ALJ) dismissed the complaint, concluding that "[n]othing in the [Commodity Exchange] Act or regulations requires a futures commission merchant to obtain the consent of a customer to liquidate positions on an undermargined account."  
Mohammed
, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 38,665.  The ALJ explained that when an account 

1-00-1585

becomes under-margined, it exposes the FCM to risk, and "[i]t is not a violation of the [Commodity Exchange] Act for a futures merchant to liquidate positions on an account to avoid such risk."  
Mohammed
, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 38,665.  If the situation were otherwise, this would mean the FCM was obligated to take risks on behalf of a customer.  "That is not the case," the ALJ said. 

Thus both 
Moss
 and 
Mohammed
 enunciate the principle that under the federal regulatory scheme, a broker is permitted to liquidate an under-margined account without prior notice.  This would be the case even if the contract with the customer required a prior margin call. 
 See 
Moss
, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,805 ("[A]ny terms contrary to the federal regulatory scheme in the area of futures trading would be unenforceable").  

In our case, we have a contract which provides for liquidation "without prior demand or notice," in full implementation of the federal policy addressed in 
Moss
 and 
Mohammed
.  This Customer Agreement between FADC and defendants provides in pertinent part that:

"In the event I [Jacobs] fail to deposit sufficient funds to pay for any commodities and/or to satisfy any demands for original and/or variation margin, or whenever in your [FADC's] sole and absolute discretion you consider it necessary, you may, 
without prior demand or notice
, when and if you deem appropriate, notwithstanding any rule of any exchange, 
liquidate the positions in my account(s)
 ***."  (Emphasis added.)  

1-00-1585

This language clearly authorizes FADC to liquidate defendants' under-margined account without prior demand or notice. 

Defendants contend that the federal regulatory scheme does require notice prior to liquidation.  They point to CFTC Rule 1.55 (17 C.F.R. §1.55 (1999)) and CME Rule 827, both of which are part of the federal scheme addressed in 
Moss
 and 
Mohammed
.   Rule 827, which as noted has been replaced by portions of CME Rule 930, provides in pertinent part that:

"D. The [merchant] may call for additional margins at his discretion, but whenever a customer's margins are depleted below the minimum amount required, the [merchant] 
must
 call for such additional margins as will bring the account up to initial margin requirements, and if within a reasonable time the customer fails to comply with such demand (the [merchant] may deem one hour to be a reasonable time), the [merchant] may close out the customer's trades or sufficient contracts thereof to restore the customer's account to required margin status."  (Emphasis added.)  
Moss
, [1992-1994 Transfer Binder], Comm. Fut. L. Rep. (CCH) at 41,803.  

According to defendants, the use of the word "must" here means that under Rule 827, a broker is required to issue a margin call before liquidating a customer's account. 

This argument was explicitly rejected by the court in 
Moss
, which emphasized that "[r]ules of this sort governing margin calls and account liquidation are for the protection of the merchant and, ultimately, for the protection of the commodities exchange itself."  
Moss
, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,803.  The court stated that: 

"The essential thrust of Rule 827 therefore is that if 

1-00-1585

the merchant chooses not to liquidate an under-margined customer, the merchant 
at least
 must issue a margin call.  Thus, while the merchant may either liquidate the under-margined customer's accounts without notice to the customer or provide the customer an opportunity to restore his account to the initial margin, the exchange rules prohibit a merchant from continuing to 'carry' an under-margined customer to the detriment of the merchant, the CME and, ultimately, the national economy."  (Emphasis in original.)  
Moss
, [1992-1994 Transfer Binder], Comm. Fut. L. Rep. (CCH) at 41,804.

Under this analysis, with which we agree, Rule 827 is not intended to extend the rights of the customer, but rather to protect the right of the brokerage house to be free from liability if it issues a margin call instead of instantly liquidating the customer's positions.  Thus, as articulated in 
Moss
, the broker may issue a margin call, but Rule 827 does not prohibit him from going a step further and liquidating the customer's under-margined account without notice.

As noted in the instant case, if FADC had failed to liquidate defendants' account when it did, defendants' losses would have been even greater by the end of the day, and far greater at the opening on the following day.  Rule 827 protects brokers such as FADC against accusations that they did not sell out soon enough.  If a broker fails to liquidate, he is protected so long as he issued a margin call.  Under the analysis in 
Moss
, Rule 827 is not designed to give the customer the right to notice before liquidation.
(footnote: 2) 

1-00-1585

CFTC Rule 1.55, which prescribes a "Risk Disclosure Statement" that futures merchants must provide to their customers, is somewhat more troublesome.  This statement, which was included in the Customer Agreement executed by FADC and defendants, provides in pertinent part that:

"You may sustain a total loss of the funds that you deposit with your broker to establish or maintain a position in the commodity futures market, and you may incur losses beyond these amounts.  If the market moves against your position, 
you may be called upon by your broker to deposit a substantial amount of additional margin funds
, on short notice, in order to maintain your position.  
If you do not provide the required funds within the time required by your broker, your position may be liquidated
 at a loss, and you will be liable for any resulting deficit in your account."  (Emphasis added.)  17 C.F.R. §1.55(b) (1999). 

Insofar as this statement is a warning, it appears to be indicative of a contemplation under CFTC regulations that there will be notice prior to liquidation.  However, it does not prohibit liquidation without notice.  It deals only with warning about the risks of the investment.  The first sentence, as set forth above, cautions the customer that he may lose all of the funds he has invested, and may incur "losses beyond these amounts." 

As noted, under 
Moss
 a contract prohibiting immediate liquidation without notice would be unenforceable as being 

1-00-1585

contrary to federal regulatory policy which mandates that such latitude be given to the broker.  However, even if we would interpret Rule 1.55 as diluting the strength of the federal regulatory policy articulated in 
Moss
, it would clearly not be sufficient to establish a contrary federal policy so as to vitiate an agreement which expressly authorizes liquidation without notice.  See 
Olmos v. Golding
, [1990-1992 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶24,893 (N.D. Ill. 1989).  There, the U.S. District Court held enforceable an agreement whose relevant terms were nearly identical to the instant Customer Agreement.  

In 
Olmos
, the plaintiff 
executed an agreement with the defendant broker which provided, in relevant part, that:

"If at any time Customer's account does not contain the amount of margin required, Broker may, but is not obligated to at any time without notice, close out Customer's positions in whole or in part ***." 
Olmos
, [1990-1992 Transfer Binder], Comm. Fut. L. Rep. (CCH) at 37,237.   

The plaintiff, a customer of the defendant commodity broker, had purchased silver futures contracts.  At the close of the silver market on March 31, 1986, the plaintiff's account was on margin call for $43,941.14.  Earlier that day, the defendant had advised the plaintiff that his account was under-margined and that unless he wire-transferred sufficient funds to meet the margin call that day, in time to be confirmed prior to the open of the silver market the next day, stop loss orders would be placed to protect 

1-00-1585

the account from going deficit. The plaintiff never transferred the funds.  The next day, April 1, 1986, the defendant broker placed stop loss orders on the plaintiff's account, and his contracts ultimately were sold.  

The plaintiff brought suit against the broker, alleging, 
inter alia
, unauthorized trading.  The defendant moved for summary judgment, and the court granted the motion.  In reaching this conclusion, the court noted that, under the terms of the agreement, "[i]n the event [the plaintiff's] account was to become underfunded for any reason, such as failure to meet a margin call, [the broker] had the authority under the Agreement, in its sole discretion, for its own protection and 
without notice
 to [the plaintiff], to close out [the plaintiff's] position by placing stop loss orders."  (Emphasis added.)  
Olmos
, [1990-1992 Transfer Binder], Comm. Fut. L. Rep. (CCH) at 37,239.

Defendants attempt to distinguish 
Olmos
 on the ground that under the specific facts in 
Olmos
, the defendant broker did as a matter of fact notify the plaintiff that his account was under-margined and that it could be liquidated if he did not wire funds to meet the margin call.  In the instant case, by contrast, defendants allege that FADC never attempted to give them a margin call.  This distinction does not alter the fact that the agreement in 
Olmos
, as the court itself noted, authorized the broker "in its sole discretion, for its own protection and 
without notice
 to [the plaintiff], to close out [the plaintiff's] 

1-00-1585

position by placing stop loss orders."  (Emphasis added.)  
Olmos
, [1990-1992 Transfer Binder], Comm. Fut. L. Rep. (CCH) at 37,239.  It is this agreement which was held enforceable in 
Olmos
.  Accord 

Geldermann & Co. v. Lane Processing, Inc.
, 527 F.2d 571, 577 (8
th
 Cir. 1975) ("Imposing requirements of demand and notification, particularly where it may be extremely difficult or time-consuming to contact an investor, would violate the manifest purpose of the [contract's] liquidation provision"). 

Defendants make essentially the same argument 

with respect to 
Geldermann
 as they do with regard to 
Moss
, 
Mohammed
 and 
Olmos
, contending that since the facts in 
Geldermann
, as in 
Moss
, 
Mohammed
 and 
Olmos
, include either an actual margin call or at least an attempt to notify the customer, these cases therefore do not stand for the proposition that a broker may liquidate without prior notice.  We disagree.  While under the facts of these cases a margin call was received or notice was attempted, the holdings clearly adhere to the proposition that no demand or notice is required prior to liquidation.  Accordingly, we conclude that the liquidation provision in the Customer Agreement between defendants and FADC is enforceable, in that no demand or notice is required on the part of a brokerage house prior to liquidating an under-margined account.  

However, we note that even if notice
 were ordinarily required prior to liquidation, which it is not, no such prior 

1-00-1585

notice would be required in this case, where defendant George Jacobs, by his own admission, was inaccessible on the day in question.  Testimony given at trial showed that on October 27, 1997, Jacobs was in Maryland, traveling by car from Connecticut to his home in Florida, and that he was periodically contacting KCM from pay telephones.  Jacobs conceded that he did not have a cell phone and that he did not give Kirk Kristian of KCM a number where he could be reached.  Thus Kirk Kristian was able to speak to Jacobs only when Jacobs called him from a pay telephone.  Jacobs also conceded that at the point when his account became under-margined, FADC could not have reached him at his residence in Florida.  

Testimony also showed that FADC knew on October 27 that Jacobs was "on the road" and could not be reached at his Florida telephone number.  It was for this reason that FADC did not call Jacobs at that number to give him a margin call.  Nevertheless, Linda Frazier, who testified as an expert on behalf of defendants, asserted that such a call still should have been made and in fact that it was required.  We disagree. 
 In the instant case, where the evidence is undisputed that the market was falling precipitously and where defendants were (by their own admission) inaccessible, there is no requirement that a broker make what would have amounted to a futile attempt to give notice prior to liquidation.  

The law should not require the performance of a useless act. 

1-00-1585

See 
Liberty National Bank of Chicago v. Newberry
, 6 Ill. App. 2d 252, 257, 127 N.E.2d 269, 272 (1955) ("Courts will not permit the doing of a useless act"); see also 
Leitch v. Sanitary District of Chicago
, 386 Ill. 433, 440, 54 N.E.2d 458, 461 (1944); 
Daven v. Downey
, 378 Ill. 543, 555, 39 N.E.2d 45, 50 (1941) (equity will not require the doing of a useless act).  In this case, where the market was undisputably in steep decline, we decline to require a broker to make an attempt to issue a margin call which would have been unquestionably futile, particularly at a time when even a minor delay could increase the risk for the broker as well as the exchange.  A broker is not obliged to take risks on behalf of a customer.  See 
Mohammed
, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 38,665.   

FADC also urges that the trial court erred in finding that FADC breached a fiduciary duty to defendants George and Deena Jacobs.  We agree. 

This court has held that "[t]he duty of care owed by a broker carrying a nondiscretionary account is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer."  
Index Futures Group, Inc. v. Ross
, 199 Ill. App. 3d 468, 475, 557 N.E.2d 344, 348 (1990); see also 
Commodity Futures Trading Comm'n v. Heritage Capital Advisory Services, Ltd.
, 823 F.2d 171, 173 (7
th
 Cir. 1987) ("Only a broker operating a discretionary account–in which the broker determines which investments to make–is viewed as a fiduciary").  

1-00-1585

In the instant case, it is undisputed that FADC did not have general discretionary authority over defendants' account.  Thus FADC's fiduciary duties 
were "exceedingly narrow," essentially reaching no further than taking orders, executing trades, and dealing with customer funds.  See 
Ross
, 199 Ill. App. 3d at 476, 557 N.E.2d at 348.  These duties were not breached by FADC's liquidation of defendants' account, which we have already concluded was authorized by the Customer Agreement and permitted by the federal regulatory scheme governing futures trading.  

Notwithstanding the foregoing, defendants argue that FADC breached its fiduciary duty by misleading defendants as to its margin and liquidation policies.  Defendants assert that, prior to opening their account with FADC, Ken Kristian of KCM informed George Jacobs that Jacobs would always receive a margin call prior to any liquidation of his positions.  As noted, this assertion was made by Jacobs in an affidavit which was attached to defendants' response to FADC's motion for summary judgment.  This affidavit was never accepted into evidence by the trial court.  In addition, when defendants attempted to proffer testimony to this effect at trial, the trial court sustained FADC's objection that the testimony was barred by the parol evidence rule.
(footnote: 3)  The trial court also rejected defendants' 

1-00-1585

contention that KCM was an agent of FADC.  Jacobs conceded at trial that no one from FADC told him that Ken Kristian either worked for FADC or that he had authority to modify the Customer Agreement between defendants and FADC.  There is nothing in the record indicating that Ken Kristian was a principal of FADC, or that his alleged statement to Jacobs would have constituted an amendment to the Customer Agreement.  There is thus insufficient basis in this record to support the conclusion that Ken Kristian's alleged statement to Jacobs regarding margin calls and liquidation could be attributed to FADC.  

Accordingly, we conclude that FADC's liquidation of defendants' account on October 27, 1997, did not constitute a breach of fiduciary duty, particularly since the upholding of any such duty would necessarily be contrary to the federal regulatory scheme, as well as to the liquidation provision of the Customer Agreement.  It would expose FADC to a risk greater than that allowed by federal law, and thus would be unenforceable.  See 
Moss
, [1992-1994 Transfer Binder], Comm. Fut. L. Rep. (CCH) at 41,805.      

We therefore reverse the trial court's finding that FADC's 

1-00-1585

liquidation of defendants' account constituted unauthorized trading, as well as the finding that the liquidation was a breach of fiduciary duty.  We also reverse the court's award of $106,511.74 in damages to defendants.  In addition, we remand this cause to the trial court for a determination as to whether defendants' refusal to pay the debit balance of $27,631.38 to FADC constituted a breach of the Customer Agreement between defendants and FADC.

Reversed and remanded with directions.

CAHILL, P.J., and COUSINS, J., concur.

FOOTNOTES
1:
According to KCM telephone records attached to FADC's memorandum in support of its motion for summary judgment, KCM received five calls from Maryland (presumably from Jacobs) on October 27, 1997.  The calls were received at 1:17 p.m., 1:47 p.m., 2:29 p.m., 2:49 p.m., and 3:23 p.m., all eastern time.   

2:
As noted, CME Rule 827 was replaced by portions of Rule 930 (particularly Rule 930.E and 930.K), which is the rule that was in effect in October 1997.  It is undisputed that there is no significant difference between Rule 827 and the relevant portions of Rule 930.  Accordingly, there is no question that the analysis articulated in 
Moss
 as to Rule 827 equally applies to Rule 930.

3:
Along these lines, we note that the Customer Agreement between defendants and FADC specifically precluded oral modification of its terms, stating that: 

"No provision of this Agreement can be amended or waived except in writing signed by a Principal of [FADC's] firm.  No oral agreements or instructions contrary to any provision of this Agreement shall be recognized or enforceable."