THE PEOPLE *ex rel.* SHELL OIL Co. *et al.*, Petitioners-Appellees, *v.* THE TOWN OF CICERO *et al.*, Respondents-Appellants.

(No. 56448;

First District (5th Division)—May 11, 1973.

Neistein, Richman, Hauslinger & Young, Ltd., of Chicago, (Harry A. Young, Jr., Allen C. Engerman, and Robert J. Lifton, of counsel,) for appellants.

Albert E. Jenner, Jr., Thomas W. McNamara, and Russell J. Hoover, all of Chicago, (Jenner & Block, of counsel,) for the People.

Mr. PRESIDING JUSTICE DRUCKER delivered the opinion of the court:

Petitioners filed an action for a writ of mandamus asking that respondents be compelled to issue them a building permit for the construction of a gas station at the northeast corner of Central and Cermak in Cicero, Illinois. After a bench trial the court entered judgment issuing the writ, and respondents appeal therefrom.

On appeal respondents contend that: (1) petitioners failed to show a clear legal right to the relief sought and (2) respondents are not estopped from requiring compliance with an amended zoning ordinance which makes a gas station a "special use" in the relevant zoning district although prior to the amendment a gas station was a "permitted use."

Petitioners Don and Altona Dodge have owned the property in question since 1933. On June 9, 1967, petitioner Shell Oil Company (Shell) entered into an option agreement with the Dodges to purchase the property for $105,000; the Dodges received $500 consideration. The contract (paragraph 6 thereof) provided that if Shell was unable to procure the necessary licenses and permits to construct the gas station, all funds given to the Dodges by Shell would be refunded upon Shell's request. The Dodges rented out the building located on the property. It contained five commercial stores, a restaurant, a tavern and three apartments; space on a sign was also leased. During 1967 and 1968 Ken Brown, an agent for the Dodges, terminated the aforementioned leases, and the building was vacated by the end of 1968; $1500 was paid by the Dodges to terminate the lease for the sign. While the premises were being vacated, Shell made a survey, plot plan and a study to evaluate the potential profitability of the site as a gas station. Shell paid the Dodges $10,000 for two extensions of time on the option. The first extension occurred on January 15, 1968, and the second on December 10, 1968. In late 1968 Brown conferred with John Kimbark, Cicero's Town Clerk, and told him of Shell's option agreement with the Dodges and Shell's intention to construct a gas station. In January 1969 Brown began soliciting bids for the demolition of the building. On March 10, 1969, Shell exercised its option to purchase. Purchase was still conditioned upon the procurement of the proper service station permits. Brown

again met with Kimbark in April 1969 at which time Kimbark informed him that the Town's Board of Trustees objected to the construction of a gas station on the site but that Brown could take up the matter with the Board.

In May 1969 Brown met with the Board of Trustees concerning Shell's plans. The Board members stated that they did not want a gas station on the subject site, but Kimbark ended the meeting by telling Brown to have Shell make a formal request for a construction permit. Shell then prepared a set of "stock plans"* and filed them along with an application for a building permit with Glen Zelenka, Cicero Building Commissioner, on July 1, 1969. Jim Thatcher, a Shell engineer, and Zelenka testified that it was the general practice to submit "stock plans" when applying for a permit to construct a gas station.

On September 17, 1969, petitioners were advised that their application for a permit had been denied at a Town Board meeting held on September 15. In December 1969 the building on the site was demolished at a cost of $5300; at the time a lawsuit was pending wherein the Town sought to correct building code violations in the Dodges' building. Ken Brown testified that demolition of the building had been contemplated for almost one year. Also in December 1969 the attorney for petitioners called the Town Clerk and asked why the building permit had been denied. The Clerk told him that the Town did not want a gas station at the location.

Petitioners then filed this mandamus action on January 14, 1970. On March 9, 1970, the Town of Cicero amended its zoning ordinance so as to provide that gas stations in the relevant zoning district were to be "special uses" and that an application for a "variance in the nature of a special use" approved by the Town Board was required to construct a gas station therein.

At a deposition of Glen Zelenka on April 2, 1970, petitioners were presented with a list of 17 deficiencies in the "stock plans" submitted by Shell. Thereafter Shell's "stock plans" were revised to allegedly correct the deficiencies, and the new set of plans and an accompanying request for a building permit were submitted to the Building Commissioner on October 26, 1970. Petitioners made no application for "a variance in the nature of a special use" as required by the amended zoning ordinance, and the plans were returned to petitioners for this reason. Shell has never entered into any construction contracts with respect to the subject site.

---

* These are standard plans of the company for its stations. It is not expected that they comply with the specifics in a municipality's building code but rather that revision thereof will be made to comply.

Based upon the foregoing facts the court issued the writ of mandamus compelling the respondents to issue a building permit to petitioners for the construction of a gas station.

*Opinion*

Respondents first contend that petitioners failed to show a clear legal right to the relief sought. They argue that the amended zoning ordinance controls and that since petitioners did not comply with the provisions thereof by applying for a "variance in the nature of a special use," the writ was improvidently granted. Petitioners counter-argue that they were not required to comply with the amended ordinance because of the established rule that any substantial change of position, expenditures or incurrence of obligations occurring in reliance upon the probability of the issuance of a building permit is sufficient to create a right in the person seeking the permit and entitles him to complete the construction and use the premises for the purposes originally authorized notwithstanding a subsequent zoning or change in zoning classification. (*Fifteen Fifty State St. v. Chicago,* 15 Ill.2d 408, 416, 155 N.E.2d 97.) Respondents acknowledged this rule of law but urge that it is inapplicable to this case.

■■ For one to benefit from the rule he must show (1) that there was a "probability" that a building permit would issue and (2) that a substantial change in position was incurred based upon this probability.

■■ From a close reading of cases dealing with the first prerequisite (*Fifteen Fifty State St. v. Chicago,* 15 Ill.2d 408, 416, 155 N.E.2d 97; *Cos Corp. v. City of Evanston,* 27 Ill.2d 570, 190 N.E.2d 364) it appears that a "probability" that a building permit will issue is present where the subject site, as in this case, is suitably zoned to permit the construction of the type of building and use thereof contemplated by the party. As stated in *Cos Corp.* at 577:

> "Where an individual or corporation expends substantial sums relying on the then existing zoning and zoning ordinances and proceeds to seek a permit in compliance with them, it would be a grave injustice to allow municipal officials to hold up an action on issuance of a building permit until an amendatory ordinance could be passed changing the standards to be met so that a permit formerly lawful would now not be issued due to an abrupt change in the law."

However, a substantial change in position in reliance on that probability must also be shown and we agree with respondents that no such change is evidenced by the facts presented here. The two substantial changes alleged to have been made were the expenditure of $10,500 by Shell to the Dodges for the original option to purchase and the two ex-

tensions of time thereon, and the demolition of the building by the Dodges at a cost of $5300.

■■ As to the first expenditure, it appears that Shell has a contractual right to recover the $10,500 from the Dodges. Paragraph 6 of the option agreement referred to in the statement of facts provides:

> "WITHDRAWAL. If at the expiration of Five Hundred and Sixty (560) days after the exercise date, any one or more of the conditions specified in article 5 [one of which is that Shell be able to procure the necessary license and permits from the proper public authorities] have not been fulfilled, Shell may, at any time thereafter, at its option \* \* \*, withdraw from this transaction and be released of all liability hereunder, by giving notice to Seller and Escrow Agent; whereupon all consideration paid for this Option and any extension hereof shall be refunded by Seller to Shell, \* \* \*."

Shell has made no unconditional commitment of its funds. See *Naumovich v. Howarth*, 92 Ill.App.2d 134, 138, 234 N.E.2d 185.

■■ As to the demolition of the building by the Dodges in December 1969, we believe that this action could no longer have been based upon the reasonable probability that a building permit would issue. In April 1969 Ken Brown, the Dodges' agent, was informed by John Kimbark, the Town Clerk, that the Town's Board of Trustees did not want a gas station constructed on the site. In May 1969 Brown met with the Board of Trustees and was again informed of its desire that a gas station not be built on the site. In September 1969 the application for a building permit was flatly denied. Petitioners do not argue that the denial of the permit was improper at this time. Respondents later informed them of 17 deficiencies in the permit application and petitioners then made corrections in an attempt to alleviate the deficiencies. Thus, when the Dodges had the building demolished in December 1969, the probability that a permit would issue was at best doubtful, and the likelihood of an amendatory ordinance seemed quite probable.

■■ The other expenditures incurred prior to the events referred to above were $1300 to terminate the lease of a sign and the preparation of plot plans and profitability studies by Shell. These are not "substantial changes" as this phrase has developed under the case law. See *People ex rel. Nat. Bank v. Cook County*, 56 Ill.App.2d 436, 206 N.E.2d 441; *Naumovich v. Howarth*, 92 Ill.App.2d 134, 234 N.E.2d 185.

■■ Petitioners urge two other arguments in requesting affirmance of the court's order. First, they argue that even if they had no right to build the gas station under the principle discussed above, the respondents should nevertheless be estopped from applying its amended zoning

ordinance to the subject property because of the inequities that would result therefrom. In support they cite *Dato v. Village of Vernon Hills,* 91 Ill.App.2d 111, 233 N.E.2d 48; *Wehrmeister v. Carlman,* 17 Ill.App.2d 171, 149 N.E.2d 453; and *Phillips Petroleum Co. v. City of Park Ridge,* 16 Ill.App.2d 555, 149 N.E.2d 344. The general principle enunciated in *Dato* and *Wehrmeister* is that affirmative acts of officers of a municipality indicating the municipality's approval of construction plans under an existing zoning ordinance will estop the municipality from relying on a subsequent amendment to the ordinance which bars the construction already condoned. This is not the case here. At no point did the respondents indicate that they would approve the construction of a gas station on the site. Therefore they are not estopped from applying the amended ordinance to the site. The significant distinction between the instant case and *Phillips* is that there plaintiff submitted an application for a building permit which the defendant municipality conceded was technically correct, *i.e.,* it was in full compliance with the existing building code. Nevertheless the municipality invalidly suspended the existing zoning ordinance which permitted the construction of gas stations in the relevant zoning district and withheld building permits until the district was rezoned to prohibit gas stations. Here, petitioners' initial application for a building permit was deficient in 17 respects. We therefore believe the case is inapposite.

■■ Second, petitioners argue that requiring them to apply for a "variance in the nature of a special use" under the amended ordinance would be a futile act in light of the actions already taken by respondents. We cannot agree. The first application for a building permit submitted was deficient in many respects according to the deposition testimony of Glen Zelenka, the Building Commissioner. The second application for a building permit was revised so as to allegedly correct the cited deficiencies, but no application for a "variance in the nature of a special use" was made as required by the then existing amended ordinance. The lack of such an application was the reason given for the cursory denial of the second request for a building permit. Therefore the proper municipal authority has not been given the opportunity to consider an application made in full compliance with existing building and zoning provisions.

■■ At any rate, we have ruled that petitioners have shown no clear legal right to a building permit under the ordinance prior to its amendment and that respondents are not estopped from applying the amended ordinance. Therefore, even if we were to conclude that a subsequent request to the Village officials for a "variation in the nature of a special use" would be a futile act, this would not benefit petitioners. To justify

the issuance of a writ of mandamus petitioners would still be required to show that the amended zoning ordinance as applied to the existing property is unconstitutional. They have never raised this issue during the course of these proceedings and it is therefore not before us to decide.

For the foregoing reasons the judgment is reversed.

Reversed.

ENGLISH and LORENZ, JJ., concur.

