THIRD DIVISION

Filed: 05/21/03

No. 1-02-1731

1350 LAKE SHORE ASSOCIATES, an Illinois limited partnership, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellant, )  Cook County.

)

v. )

)

ALICIA MAZUR-BERG, Commissioner, Department of Planning and Development of )

the City of Chicago, and CITY OF CHICAGO, an Illinois municipal corporation, )

)

Defendants-Appellees, )

)

and )

)

EDWARD T. JOYCE, CARL HUNTER, JOHN STASSEN, JOHN C.  MULLEN, )

CLARK W. FETRIDGE, RESPICIO F. VASQUEZ, and  BERNARD J. MILLER, )  Honorable

)  Julia M. Nowicki

Intervenors-Appellees. )  Judge Presiding.

JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, 1350 Lake Shore Associates (LSA), appeals from an order by which the circuit court: (1) refused to compel the Zoning Administrator of the City of Chicago (Zoning Administrator) to issue LSA a zoning certificate in connection with certain plans it had submitted to the Department of Planning and Development of the City of Chicago (Department of Planning) for the construction of a high-rise building at 1320-30 Lake Shore Drive in Chicago; (2) refused to enjoin the City of Chicago and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent LSA from developing the property in question in accordance with the terms of a certain residential planned development ordinance which was passed in November 1978; and (3) entered a declaratory judgment that LSA was not entitled to either a zoning certificate or a building permit in connection with the plans it submitted to the Department of Planning.  For the reasons which follow, we affirm in part, reverse in part, and remand with directions.

The following facts are undisputed.  LSA has owned the property located at 1320-30 Lake Shore Drive (the property) at all times relevant to this appeal.  On November 14, 1978, the Chicago City Council approved LSA's application to amend the Chicago Zoning Ordinance by re-zoning the property in question from an "R8 General Residence District" classification to "Residential Planned Development 196" (RPD 196), permitting the construction of a high-rise apartment building.  At the time RPD 196 was established, the Chicago Zoning Ordinance provided that a property owner who proposed to develop property as a planned development must do so "contemporaneously or within a proposed extended period of time commensurate with the character of the proposal but in no event to exceed 20 years."  Chicago Zoning Ordinance §11.11-1 (1978).  On December 10, 1997, Charles Bernardini, then alderman of Chicago's 43
rd
 Ward, in which the property is located, introduced an ordinance (hereinafter referred to as the down-zoning ordinance) proposing to change the property's zoning from RPD 196 to an "R6 General Residence District," a classification which does not permit the construction of a high-rise building.  The following day, LSA, through an architect it had hired, submitted architectural plans for a high-rise building (Part II Submittal), seeking the issuance of a Part II Approval, to the Department of Planning.   For property located in a planned development, a Part II Approval, a statement certifying that the architectural plans submitted comply with all provisions of the applicable planned development ordinance, is a prerequisite to the issuance of a zoning certificate which, in turn, is a prerequisite to the issuance of a building permit.  See Chicago Zoning Ordinance §11.5 (amended 7-21-99),  §11.11-3(b) (amended 12-11-91).  Although the plans submitted complied fully with the requirements of RPD 196, the Department of Planning took no action on LSA's Part II Submittal.  On April 29, 1998, the Chicago City Council approved the down-zoning ordinance, which became effective on May 20, 1998.

LSA filed its initial complaint in this action on August 25, 1998, naming as defendants the Commissioner of the Department of Planning (Commissioner) and the City of Chicago (City) (hereinafter referred to collectively as the City defendants).  Thereafter, it filed a substantially similar complaint under a different docket number.  LSA attached to the second complaint a certificate of compliance with section 11-13-8 of the Illinois Municipal Code (65 ILCS 5/11-13-8 (West 1998)), which required that it give owners of property located within 250 feet of the property notice of any suit in which it sought a declaration that the down-zoning ordinance was invalid. The two actions were consolidated.    Edward T. Joyce, Carl Hunter, John Stassen, John C. Mullen, Clark W. Fetridge, Respicio F. Vasquez, and Bernard J. Miller (hereinafter referred to collectively as the intervenors), all of whom own property located within 250 feet of the property and had been served with notice of the second complaint, filed their appearances in the consolidated action.

LSA's first amended complaint contained three counts.  Count I sought a writ of 
mandamus
 directing the Commissioner to issue a Part II Approval.  Count II sought a declaration that the down-zoning ordinance does not affect LSA's right to develop the property in conformity with RPD 196 and an injunction barring the City from enforcing the down-zoning ordinance against it.  Count III sought a declaration that the down-zoning ordinance is void.  The trial court later granted LSA's motion to voluntarily dismiss count II.

 LSA filed a motion for summary judgment on count I of its first amended complaint, arguing that it had obtained a vested right to the issuance of a Part II Approval and the Commissioner was not entitled to delay or deny the issuance of such approval despite the fact that the down-zoning ordinance was pending at the time LSA filed its Part II Submittal and was later adopted.  The trial court denied LSA's motion and scheduled an evidentiary hearing on count I.  It subsequently granted the intervenors leave to intervene with respect to count I.

Commencing on January 18, 2000, the court conducted a bench trial on count I of LSA's first amended complaint.  Following the trial, on March 9, 2000, the trial court issued a written memorandum of opinion in which it entered judgment in favor of the City defendants and the intervenors, thereby denying LSA's request for a writ of 
mandamus
 directing the Commissioner to issue it a Part II Approval.  It found that "from the very commencement of this project in 1996," LSA could not reasonably rely on the probability that it would obtain a Part II Approval and, thus, had not obtained a vested right thereto.  On March 27, 2000, the trial court made a finding that there was no just reason to delay enforcement of or appeal from its March 9, 2000, order.  LSA appealed pursuant to Supreme Court Rule 304(a).  155 Ill. 2d R. 304(a).  On November 29, 2001, we reversed the trial court's order entering judgment in favor of the City defendants and the intervenors on count I of LSA's first amended complaint and remanded the case to the circuit court with directions that it issue a writ of 
mandamus
 requiring the Commissioner to issue a Part II Approval to LSA.  
1350 Lake Shore Associates v. Hill
, 326 Ill. App. 3d 788, 797-98, 761 N.E.2d 760 (2001).  Our decision in this regard was not based upon a conclusion that the trial court's finding that LSA had not made substantial expenditures in good faith reliance on the issuance of a Part II Approval was against the manifest weight of the evidence.  Rather, we held that the trial court erred when it applied the pending ordinance doctrine, which allows a municipality to delay ruling on a building permit application when an amendatory zoning ordinance is pending which would prohibit the issuance of the permit (
Chicago Title & Trust Co. v. Village of Palatine
, 22 Ill. App. 2d 264, 268, 160 N.E.2d 697 (1959)), in the context of an application for a Part II Approval.  We made clear that we were expressing no opinion as to whether or not LSA is entitled to either a zoning certificate or a building permit in connection with the plans it submitted.

Upon remand, on January 23, 2002, LSA filed a "Motion for Entry of Final Judgment Order" in which it requested that the trial court enter orders: (1) requiring the Commissioner to issue it a Part II Approval; (2) requiring the Zoning Administrator, upon receipt of the Part II Approval, to issue a zoning certificate; and (3) "enjoining the City and its agents from enforcing the provisions of the Chicago Zoning Ordinance insofar as any portion of that ordinance prevents [LSA] from any right to which it may be entitled by virtue of its Part II Approval and zoning certificate, including the right to have a building permit application processed without reference to the down-zoning ordinance that became effective in May, 1998."  On February 4, 2002, the intervenors filed a motion for declaratory judgment, seeking a declaration that LSA is entitled to neither a zoning certificate nor a building permit in connection with the plans for which this court ordered that a Part II Approval be issued.

On March 12, 2002, the trial court heard arguments on the parties' pending motions.  During those arguments, the trial court noted that LSA had never applied for a zoning certificate or a building permit and that, in its first amended complaint, it sought only a writ of 
mandamus
 directing the Commissioner to issue a Part II Approval.  Nonetheless, the trial court observed, in its motion for the entry of a final judgment, LSA was seeking relief in the form of orders directing the Zoning Administrator to issue a zoning certificate and enjoining the City and its agents from enforcing any portion of the Chicago Zoning Ordinance which would prevent LSA from exercising "any right to which it may be entitled by virtue of its Part II Approval and zoning certificate, including the right to have a building permit application processed without reference to the down-zoning ordinance."  The City defendants acknowledged that, if LSA did file an application for a zoning certificate and a building permit, they would apply the down-zoning ordinance and deny the application.  All parties consented to the trial court granting LSA leave to amend its complaint to include requests for the relief sought in its motion for the entry of a final judgment.
(footnote: 1)  The parties additionally consented to having the trial court decide the issue of LSA's entitlement to the relief at issue based upon the evidence introduced at the trial conducted on count I of LSA's first amended complaint.  The evidence introduced at that trial established the following relevant facts.

In August 1995, William Bennett, president and chief executive officer of Draper and Kramer, Inc. (Draper) and president of D & K Insurance Agency, Inc., which is an affiliate of Draper and a general partner of LSA, ordered a review of Draper's assets.  He learned that LSA owned the property in question and that it had obtained zoning approval for the construction of a high-rise apartment building.  Interested in the possibility of developing the property, Draper consulted two law firms, seeking opinions as to LSA's rights to develop the property pursuant to RPD 196.

The law firms of Bell, Boyd & Lloyd and Rosenthal & Schanfield responded to Draper's inquiries by way of letters dated February 20, 1996, and March 1, 1996, respectively.  Both firms advised Draper that, in order to protect its rights to develop the property in accordance with RPD 196, LSA would need to obtain a building permit and commence construction, completing at least the excavation and pouring of the foundations, prior to the fall of 1998 and that, if it failed to do so, RPD 196 would expire at that time.  Bell, Boyd & Lloyd cautioned Draper that, when community members oppose a project, the Department of Planning's staff and the alderman of the ward in which the property is located become very inflexible.  It further advised that LSA should avoid litigation regarding its right to proceed under RPD 196.

Bennett testified that, based on the legal advice Draper had received, as well as marketing studies and preliminary architectural drawings, he recommended to LSA that it proceed with the construction of a high-rise apartment building.   Thereafter, LSA authorized Draper to proceed with the project on its behalf.  In January or February 1997, Draper, acting on behalf of LSA, hired Solomon Cordwell Buenz & Associates, Inc. (SCB) as the architect for the project.  In January 1997, Draper hired Jack Guthman, an attorney specializing in zoning law.  Draper subsequently hired a surveyor, an urban planner, an elevator consultant, and an artist, engaged to create a rendering from the architect's conceptual drawings.

Bernardini and his chief of staff, Vi Daley, testified that they first learned of LSA's proposed project in the spring of 1997, when they received a telephone call from a concerned resident.  In April 1997, Daley contacted Phil Levin, who was then director of the Department of Planning.  Levin informed her that the property owners had the right to build pursuant to RPD 196 until November 14, 1998.

Upon being hired, Guthman suggested that representatives of Draper meet with Bernardini and members of the community.  In the spring of 1997, a meeting took place at Draper's office at which Bennett, Guthman, Draper employee William VanSenus, and Bernardini were present.
(footnote: 2)  At the meeting, Bernardini was informed of the property's existing zoning and shown preliminary building designs.  Guthman, Bennett, and VanSenus all testified that, after viewing the plans, Bernardini requested that Draper find a way to add more parking.  VanSenus testified that Bernardini also asked if the appearance of the building's facade could be improved.   According to the three men, Bernardini made no mention of opposition from community members or down-zoning.  Bernardini's account of the meeting differed, although he acknowledged he expressed concern that the proposed plan did not provide enough parking spaces and that he did not mention down-zoning at the meeting.  According to Bernardini, he told Draper employees that the proposed development would be controversial due to its size and density and, if they wanted his support, they should meet with neighborhood organizations and residents to reach an agreement.  Following this meeting, Draper instructed SCB to prepare revised plans adding more parking spaces and making changes to the building’s facade.

Guthman testified that, after the initial meeting with Bernardini, which he estimated took place in April or May 1997, he next met with the alderman on August 1, 1997.  Guthman further testified that, at that time, Bernardini mentioned that some residents had asked him to down-zone the property.  According to Guthman, though, Bernardini did not express an intention to introduce a down-zoning ordinance.  Rather, he asked Guthman whether it would be possible to reduce the density of the building as that seemed to be the primary complaint.  Bernardini testified that, following the spring 1997 meeting with Draper representatives, he had "regular periodic discussions" with Guthman.  Asked when he first mentioned to any Draper representative that he was considering the possibility of down-zoning the property, Bernardini testified that he did so "shortly after" his first meeting with Draper representatives, which he estimated took place in late in April or early in May.  According to Bernardini, at that time, he told Guthman that he was getting more and more complaints about the project, that he had been asked to down-zone the property, and that he was hopeful that a compromise could be reached so that he would not have to do so.  Bernardini did not think this conversation took place as late as August 1, 1997.  He further testified that he made it clear to Guthman from very early on that the property would be down-zoned if no agreement was reached.

Guthman testified that, shortly after his second meeting with Bernardini, he reported to Draper that the alderman had been asked to down-zone the property and that it was important to find a way to resolve the matter.  He surmised that he reported this to both Bennett and VanSenus, but stated he may have told only one of the men.

According to Bennett, late in the summer or early in the fall of 1997, Guthman advised him there was pressure building in the neighborhood against the high-rise development but did not, at that time, mention the possibility of down-zoning.  Bennett testified that Guthman relayed Bernardini's desire that Draper meet with concerned members of the community, which he agreed to do.   Bennett testified, though, that, until shortly prior to the introduction of the down-zoning ordinance in December 1997, none of Draper's legal experts ever told him that the property's zoning could be changed prior to the expiration of RPD 196.  VanSenus, on the other hand, testified that he believed that either Guthman or Bennett told him that Bernardini had been asked to down-zone the site.  He believed he had some conversation with Bennett regarding the issue.

Bennett and VanSenus both testified that they were aware that, in the summer of 1997, community members posed strong opposition to a building which another developer proposed to construct at Stone and Goethe, located in a neighboring ward.  On August 8, 1997, Guthman sent Alice Rebechini, a Draper employee, a memorandum to which he attached an article referencing the Stone-Goethe development as well as what appears to be an excerpt from a community organization newsletter expressing opposition to the Stone-Goethe project and the instant project.  In the memorandum, Guthman stated: "Obviously, the attached is not helpful.  The very fact that there are a number of developments being challenged along the lakefront may weigh on Alderman Bernardini."  Rebechini forwarded Guthman's memorandum and attachments to Bennett and VanSenus.  Both men testified that they did not think the Stone-Goethe controversy affected the likely success of the instant project.

In July 1997, Draper authorized its architect, SCB, to begin preparing the Part II Submittal, which required the development of more detailed plans and was part of the schematic phase.  VanSenus testified that, sometime late in the summer or early in the fall of 1997, Draper instructed SCB to stop work for a period of a few weeks or months while it conducted a search for an equity partner.  It instructed SCB to resume work in mid-October 1997.

In October 1997, Draper employees again met with Bernardini, showing him the revised plans addressing his concerns about parking and the facade.  Bernardini told them to show the plans to members of the community.  Guthman testified that he spoke to Bernardini sometime around October 22, 1997, at which time Bernardini expressed an increased sense of urgency regarding the need for Draper to reach a compromise with community members.  According to Guthman, at that time, Bernardini held out the introduction of a down-zoning ordinance as a threat to cause Draper to negotiate with community organizations.

In November 1997, Bennett met with Tom Begal and Jim Gidwitz, members of the Near North Preservation Coalition, which opposed the high-rise building.  The men told Bennett there was growing opposition to the project among community members, with the primary concern being the density of the proposed building.  Bennett stated that Draper was willing to cooperate with members of the community so long as it could do so while maintaining "the economics of the property."

Begal, Gidwitz, and several others met with Bernardini on November 17, 1997, and requested that he introduce a down-zoning ordinance, which he agreed to do at a Chicago City Council meeting on November 19.  Guthman testified that he went to see Bernardini upon learning of his plans.  It was Guthman's understanding that real progress was being made between Draper and members of the community, and, as a result, he asked Bernardini not to submit the ordinance as he thought that such an action would be detrimental to negotiations.  According to Guthman, Bernardini agreed to wait until the next council meeting to submit the ordinance, but asked in return that Draper not file its Part II Submittal before then.  Guthman agreed.  Bernardini denied ever having asked Draper to delay its filing of a Part II Submittal.

No compromise was reached by the date of the next Chicago City Council meeting, December 10, 1997, and Bernardini introduced the down-zoning ordinance on that date.  The following day, SCB submitted a Part II Submittal for the project to the Department of Planning.  Between February and April 1998, Guthman's law firm wrote Levin three letters requesting a response to the Part II Submittal.  On April 29, 1998,  the Chicago City Council approved the down-zoning ordinance, which became effective on May 20, 1998.  The Department of Planning never responded to the Part II Submittal.

LSA presented evidence, via the testimony of VanSenus, invoices, and a “Development Expenditure Summary” introduced into evidence as an exhibit, regarding the expenses Draper incurred on LSA’s behalf in connection with the project.

On March 12, 2002, the trial court entered a written order in which it: (1) granted LSA leave to amend its complaint to include prayers for the relief requested in its motion for the entry of a final judgment; (2) entered judgment in part in favor of LSA by directing the Commissioner to issue a Part II Approval; (3) entered judgment in part in favor of the City defendants and intervenors by denying LSA's requests for orders requiring the Zoning Administrator to issue it a zoning certificate and enjoining the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from exercising "any right to which it may be entitled by virtue of its Part II Approval and zoning certificate, including the right to have a building permit application processed without reference to the down-zoning ordinance;" and (4) granted the intervenors' motion for a declaratory judgment.

Thereafter, LSA filed a second amended complaint, adding requests for the entry of orders requiring the Zoning Administrator to issue it a zoning certificate and enjoining the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from exercising its rights pursuant to RPD 196.  In a subsequently filed third amended complaint, LSA substituted Alicia Mazur-Berg, the current Commissioner, for Christopher Hill, her predecessor.  LSA also filed a motion for reconsideration of the trial court's March 12, 2002, ruling and a motion asking the court to make the requisite Rule 304(a) findings.

On May 30, 2002, the trial court heard arguments on LSA's motions to reconsider and for Rule 304(a) findings in addition to entertaining further argument on LSA's motion for the entry of a final judgment and the intervenors' motion for a declaratory judgment.  In a memorandum order entered on May 31, 2002, the trial court: (1) entered judgment in part in favor of LSA on count I of its third amended complaint, directing the Commissioner to issue a Part II Approval; (2) entered judgment in part in favor of the City defendants and the intervenors on count I of LSA's third amended complaint, by denying LSA's requests for orders requiring the Zoning Administrator to issue it a zoning certificate and prohibiting the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from exercising "any right to which it may be entitled by virtue of its Part II Approval and zoning certificate, including the right to have a building permit application processed without reference to the down-zoning ordinance;" (3) granted the intervenors' motion for a declaratory judgment that LSA is not entitled to a zoning certificate or a building permit in connection with the plans it submitted to the Department of Planning; (4) denied LSA's motion for reconsideration; and (5) granted LSA's request for Rule 304(a) findings.  In its order, the trial court stated its finding that expenses associated with the project were not incurred "in good faith reliance on the continued zoning classification, but rather were incurred in the hope of reaching a compromise."

On appeal, LSA contends that the trial court erred in entering judgment in part in favor of the City defendants and the intervenors on count I of its third amended complaint.  As stated earlier, on remand, the trial court, upon the stipulation of the parties, based its ruling on the evidence introduced at the first trial.  When a challenge is made to the trial court's ruling following a bench trial, we review the judgment to determine if it is against the manifest weight of the evidence.  
Brody v. Finch University of Health Services/Chicago Medical School
, 298 Ill. App. 3d 146, 153, 698 N.E.2d 257 (1998).  A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly evident or the factual findings on which it is based are unreasonable, arbitrary or not based on the evidence.  
Brody
, 298 Ill. App. 3d at 153.

LSA first argues that the trial court erred in refusing to order the Zoning Administrator to issue it a zoning certificate because, once it obtains a Part II Approval, it is automatically entitled to a zoning certificate.  It further contends that, having obtained a Part II Approval and a zoning certificate, it cannot be denied a building permit on zoning grounds.  We disagree.

First, we must reject LSA's assertion that the trial court erred in refusing to order the Zoning Administrator to issue it a zoning certificate for the simple reason that LSA has not yet applied for one.  According to the Chicago Zoning Ordinance, there is no separate application for a zoning certificate; rather, an application for a building permit is deemed to be an application for a zoning certificate.  Chicago Zoning Ordinance §11.5-1 (amended 11-17-93).  LSA, however, has never filed an application for a building permit.  We recognize that the parties agreed to have the trial court determine LSA's rights with regard to the issuance of a zoning certificate and a building permit in accordance with the plans it submitted even though LSA had not yet applied for such items.  However, even if the evidence at trial established that LSA had obtained a vested right to obtain a zoning certificate pursuant to RPD 196, it would be improper for the trial court to order the issuance of the certificate before LSA actually applied for it.

Further, we reject LSA's assertion that, once it obtains a Part II Approval, it is automatically entitled to a zoning certificate and cannot be denied a building permit on zoning grounds.  The Chicago Zoning Ordinance provides that the Zoning Administrator shall issue all zoning certificates and that a zoning certificate warrants that the proposed building or structure complies with all provisions of the zoning ordinance.  Chicago Zoning Ordinance §11.2-2 (1999); §11.5 (amended 7-21-99).  LSA, however, points us to section 11.11-3(b) of the Chicago Zoning Ordinance, which provides that zoning certificates "shall be issued by the Zoning Administrator for *** buildings *** within the planned development only upon receipt of written approval by the Commissioner."  Chicago Zoning Ordinance §11.11-3(b) (amended 12-11-91).  LSA reads this language to provide that the Zoning Administrator must issue a zoning certificate if the Commissioner approves of the applicant's plans.  We reject this proposed interpretation of section 11.11-3(b) as we find it to be contrary to the plain language of the ordinance.  See 
Village of Glenview v. Ramaker
, 282 Ill. App. 3d 368, 371, 668 N.E.2d 106 (1996)(construction of an ordinance begins and ends with the language thereof when the meaning is clear).  Section 11.11-3(b) states that, with regard to property located in a planned development, the Zoning Administrator cannot issue a zoning certificate unless and until he receives the Commissioner's approval.  It does not, however, state that the Zoning Administrator must issue a zoning certificate upon receiving the Commissioner's approval.  As we stated in our earlier decision, although the owner of property located within a planned development "cannot obtain either a zoning certificate or a building permit without first obtaining a Part II Approval letter, there is nothing in the Zoning Ordinance which guarantees that a property owner who obtains a Part II Approval letter will necessarily obtain either a zoning certificate or a building permit."  
1350 Lake Shore Associates
, 326 Ill. App. 3d at 797.  This is because the Commissioner determines only whether the proposed use or structure complies with the requirements of the applicable planned development ordinance, whereas the building commissioner and the Zoning Administrator warrant that the proposed use or structure complies with all provisions of the Chicago Zoning Ordinance.  
Lake Shore Associates
, 326 Ill. App. 3d at 797.  As such, we reject LSA’s contention that, after the Commissioner issues a Part II Approval, the Zoning Administrator may never delay issuance of a zoning certificate where an amendatory zoning ordinance is pending or deny the certificate where, as here, such an ordinance has been passed.

We next address the City defendants' contention that under no circumstances will LSA be entitled to obtain a building permit pursuant to RPD 196 because it did not apply for one before: (1) the passage of the down-zoning ordinance, and (2) the November 1998 expiration of RPD 196.  They argue that they do not have the authority to issue a building permit in violation of the property’s current zoning.  We disagree.  As will be discussed herein, if LSA incurred substantial expenses  in good faith reliance on the issuance of a building permit pursuant to RPD 196, it acquired a vested right to the issuance of such a permit despite the passage of the down-zoning ordinance.   
O'Connell Home Builders, Inc. v. City of Chicago
, 99 Ill. App. 3d 1054, 1060, 425 N.E.2d 1339 (1981).  We find no significance to the fact that LSA’s building permit application will have been filed after the down-zoning ordinance was passed.  See 
American National Bank & Trust Co. of Chicago v. City of Chicago
, 19 Ill. App. 3d 30, 34, 311 N.E.2d 325 (1974) (there is nothing in the vested rights doctrine which requires that a building permit application precede proposed change in law).  Nor can we say that LSA’s failure to file the building permit application prior to the November 1998 expiration date of RPD 196 will prevent it from obtaining the permit if it has acquired a vested right thereto.  LSA took the preliminary step of applying for a Part II Approval well before the expiration of RPD 196, and the Commissioner wrongfully withheld the approval.    The City defendants assert that, despite the fact that the Commissioner wrongfully withheld a Part II Approval, LSA was nonetheless required to prepare the more detailed architectural plans necessary to obtain a building permit and to actually apply for that permit.  They assert that this was necessary because, in order for LSA to preserve its rights under RPD 196, it needed to demonstrate that it was willing and able to commence construction before the expiration of RPD 196.  We disagree.  As the issuance of a Part II Approval is a condition precedent to the issuance of a building permit, it would have been futile for LSA to have incurred the additional expense involved in preparing an application for a building permit before having received the Part II Approval.   See 
Geary v. Dominick's Finer Foods, Inc.
, 129 Ill. 2d 389, 400, 544 N.E.2d 344 (1989) (the law will not require the performance of a futile or useless act); 
First American Discount Corp. v. Jacobs
, 324 Ill. App. 3d 997, 1012, 756 N.E.2d 273 (2001) (same).  Further, the City defendants presented no evidence that, if the Commissioner had timely issued LSA a Part II Approval for which LSA applied in December 1997, LSA could not have prepared the building permit application, obtained the permit, and commenced construction before the November 1998 expiration of RPD 196.  Accordingly, we reject the City defendants’ argument in this regard.

We now turn to LSA's contention that the trial court's finding that the expenses it incurred on the project were not incurred in good faith reliance on the issuance of a zoning certificate and a building permit is against the manifest weight of the evidence.

It is well-settled that there is no vested right to the continuation of a statute or ordinance, and this general rule applies to zoning ordinances.  
Pioneer Trust & Savings Bank v. Cook County
, 71 Ill. 2d 510, 517, 377 N.E.2d 21 (1978); 
O'Connell Home Builders, Inc.
, 99 Ill. App. 3d 1054 at 1060.  There are, however, circumstances under which a party may obtain a vested right to develop its property in accordance with a certain zoning ordinance despite an amendment thereto.  As our supreme court explained in  
People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove
, 16 Ill. 2d 183, 191, 157 N.E.2d 33 (1959):

"[W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use of the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classification."

The vested rights doctrine has been applied with respect to a property owner’s entitlement to building permits and, in conjunction therewith, zoning certificates.  
Pioneer Trust & Savings Bank
, 71 Ill. 2d 510; 
People ex rel. National Bank of Austin v. County of Cook
, 56 Ill. App. 2d 436, 206 N.E.2d 441 (1965).  The determination as to whether a property owner has obtained a vested right to the issuance of a zoning certificate and a building permit pursuant to a particular zoning ordinance involves a two-part inquiry, namely: (1) which of the expenditures the property owner made or obligations it incurred were made or incurred in good faith reliance on the probability that it would obtain a zoning certificate and a building permit pursuant to the current zoning ordinance; and (2) whether those expenditures or obligations were substantial.  
American National Bank & Trust Co.
, 19 Ill. App. 3d at 34.  In the instant case, the trial court, having determined that none of the expenses that LSA incurred from the very commencement of the project in 1996 were in good faith, did not consider the substantiality of the expenditures.

There is no bright-line test for determining whether a party's expenditures have been made in good faith reliance on the probability that a zoning certificate or a building permit will issue.  As LSA points out, it has been stated that "[a] probability that approval is forthcoming exists when the property at issue is zoned to permit the use requested by the landowner."  
Bank of Waukegan v. Village of Vernon Hills
, 254 Ill. App. 3d 24, 31, 626 N.E.2d 245 (1993); see also 
People ex rel. Shell Oil Co. v. Town of Cicero
, 11 Ill. App. 3d 900, 904, 298 N.E.2d 9 (1973).   Thus, LSA initially argues that all of the expenses it incurred prior to the passage of the down-zoning ordinance were incurred in good faith reliance on the issuance of a zoning certificate and a building permit under RPD 196.  A cursory examination of the extensive case law in this area, however, reveals that the statement upon which LSA relies in this regard is overly broad.  No doubt, expenses incurred at a time when the current zoning permits the intended use and when the property owner has no knowledge that an amendment to the ordinance is being considered are incurred in good faith reliance on the issuance of a zoning certificate and a building permit and, if substantial, create a vested right.  See 
Illinois Mason Contractors, Inc. v. City of Wheaton
, 19 Ill. 2d 462, 167 N.E.2d 216 (1960); 
O’Connell Home Builders, Inc.
, 99 Ill. App. 3d 1054; 
Mattson v. City of Chicago
, 89 Ill. App. 3d 378, 411 N.E.2d 1002 (1980).  It has been held, however, that expenses which a property owner incurs with knowledge that an amendatory ordinance, pursuant to which the intended use would not be permitted, is pending, are not incurred in good faith reliance on the probability that a zoning certificate or a building permit will issue.  See 
VonBokel v. City of Breese
, 100 Ill. App. 3d 956, 427 N.E.2d 322 (1981).  Accordingly, the expenses which Draper incurred on LSA’s behalf after the down-zoning ordinance was introduced on December 10, 1997, could not have been in good faith reliance on the issuance of a zoning certificate and a building permit.

It is not necessarily the case, however, that all expenses incurred prior to the actual introduction of an amendatory zoning ordinance are made in good faith reliance on the issuance of a zoning certificate and building permit pursuant to the current zoning.  In 
American National Bank & Trust Co. of Chicago v. City of Chicago
, 19 Ill. App. 3d 30, 311 N.E.2d 325 (1974), an amendatory zoning ordinance was introduced five days after the plaintiff applied for a building permit.  The respondents argued that there was such wide-spread media coverage of the fact that a proposed zoning change was under consideration that the plaintiffs could not have reasonably relied on the issuance of a permit pursuant to the current zoning.  In affirming the trial court’s finding of substantial reliance and issuance of a writ of 
mandamus
, this court stated: “That at some point the petitioners were aware of the proposal is obvious.  The real question is whether the awareness preceded their expenditure, and there is no evidence in this record that such was the case.”  
American National Bank & Trust Co. of Chicago
, 19 Ill. App. 3d at 36.  This suggests that knowledge that an amendatory ordinance is likely to be introduced in the near future may prevent a finding of good faith reliance.  In 
People ex rel. Shell Oil Co. v. Town of Cicero
, 11 Ill. App. 3d 900, 298 N.E.2d 9 (1973), shortly after the plaintiffs began taking steps to put a gas station on their property, a permitted use under the then current zoning, they were told by the town's board of trustees that it did not want a gas station on the property.  The plaintiffs then submitted a permit application, which the board denied.  Two months after the denial of their permit application, the plaintiffs incurred the expense of having a building located on the property demolished.  After the plaintiffs filed a 
mandamus
 action, the town amended its zoning ordinance.  
People ex rel. Shell Oil Co.
, 11 Ill. App. 3d at 903-04.  The circuit court issued a writ directing the defendants to issue a building permit for the construction of a gas station on the subject property, and this court reversed.  Even though there was no evidence that anyone had mentioned the possibility of a down-zoning ordinance to the plaintiffs prior to its introduction, this court found that, at the time the plaintiffs incurred the expense in question, “the probability that a permit would issue was doubtful at best, and the likelihood of an amendatory ordinance seemed quite probable.”  
People ex rel. Shell Oil Co.
, 11 Ill. App. 3d at 905.

From these cases, we are able to glean the proposition that, once a property owner becomes aware that it is probable that an amendatory zoning ordinance will be introduced, it can no longer be said to be able to rely in good faith on the probability that a zoning certificate or a building permit will issue pursuant to the property's current zoning.  See 
Shell Oil Co
,, 11 Ill. App. 3d at 905 ("the likelihood of an amendatory ordinance seemed quite probable"); 
Naumovich v. Howarth
, 92 Ill. App. 2d 134, 139, 234 N.E.2d 185 (1968)(one of the factors to consider in making a vested rights determination is "notice of 
likelihood
 of change in law prior to change in position" (emphasis added))   We do not, however, believe that a property owner's knowledge that there is a mere possibility, as opposed to a probability, that an amendatory zoning ordinance will be introduced will have the same effect.  The test for determining whether a property owner has obtained a vested right is whether "there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon 
the probability of its issuance
." (Emphasis added.)  
People ex rel. Skokie Town House Builders, Inc.
, 16 Ill. 2d at 191. The mere possibility that an amendatory zoning ordinance will be introduced does not, in our opinion, render it improbable that a zoning certificate or a building permit will be issued pursuant to the current zoning.  With these principles in mind, we turn to the trial court's findings in the instant case.

In its March 9, 2000, order, entered following the initial trial in this case, the trial court found that "from the very commencement of this project in 1996," LSA could not reasonably rely on the probability that it would obtain a Part II Approval.  At the May 30, 2002, hearing, the trial court stated that the factual findings it made following the first trial in the context of whether LSA had obtained a vested right to a Part II Approval applied "equally now to the issue before the Court regarding the issuance of permits."  Accordingly, we must review the trial court's above-stated ultimate conclusion, as well as all the factual findings it made in support of this conclusion, in the context of whether LSA could reasonably rely on the issuance of a zoning certificate and a building permit.  In support of the ultimate conclusion stated in its March 9, 2000, order, the trial court noted the facts that the ordinance was 17 years old and had faced opposition from community members at the time it was passed and that Bell, Boyd & Lloyd's opinion letter to Draper raised “so many issues relevant to the viability of the project that, at best, it can be described as putting the plaintiff on notice to proceed with caution and, at worst, as notice that the plaintiff was heading for a veritable mine field of problems should it pursue the project.”  The court further noted that there was conflicting testimony as to when Bernardini first used the term down-zoning.  It concluded, however, that "an exact rendition of the conversations in April, 1997, and thereafter, is less important than the meaning conveyed at those early encounters."  As to what meaning was, in fact conveyed, the court found that "it is clear that the message from the Alderman was that a compromise was necessary to prevent adverse consequences."  The trial court also found to be significant the “pervasive opposition” to the Stone-Goethe project and Guthman’s statement, in a memorandum to a Draper employee, that such opposition “may weigh heavily on Alderman Bernardini.”  Further, the court stated that all of the actions Draper took on behalf of LSA demonstrate it was aware that the project was “in jeopardy.”  According to the court, these actions included consulting two law firms for opinions as to LSA's right to proceed pursuant to RPD 196, hiring Guthman and meeting with Bernardini.  The court further noted that: LSA never obtained financing for the project; LSA did not seek the approval of 60% of its partners, which it needed to proceed with the project, until this litigation commenced; a proposed partnership between LSA and Draper for the development of the property was never formed; the architect was never authorized to go beyond the conceptual design phase; and the Part II Submittal was not filed until December 11, 1997.  The trial court found that these facts constituted “independent proof” that LSA was waiting for assurances before proceeding with the project.

Although the trial court concluded that "from the very commencement of this project in 1996," LSA could not have reasonably relied on the issuance of a building permit, only three of the facts which it cited in support of its conclusion were known to LSA in 1996; namely: (1) that RPD 196 was then 17 years old; (2) that RPD 196 had faced substantial opposition from members of the community at the time of its passage; and (3) the substance of the legal advice Draper had obtained from the two firms it consulted early that year.  We find that none of these facts supports the trial court's conclusion.

Initially, we find no support for the proposition that the age of a law, or the fact that it was subject to opposition from members of the community prior to its passage, affects its validity or makes it more likely that the law is going to be changed in the near future.  Indeed, the fact that RPD 196 had been in effect for 17 years apparently without any attempt being made to amend it could well be a factor supporting, rather than defeating, a finding of good faith reliance on the probability of the issuance of a zoning certificate and a building permit pursuant thereto.  See 
Sgro v. Howarth
, 54 Ill. App. 2d 1, 9-10, 203 N.E.2d 173 (1964).

The trial court also based its finding that LSA could not, from the very commencement of the project, reasonably rely on the issuance of a zoning certificate and a building permit pursuant to RPD 196 in part upon the opinion letter that Draper obtained from Bell, Boyd & Lloyd.  However, we do not read the letter in question as warning Draper that a building permit was not likely to issue but, rather, as advising Draper of the steps that needed to be taken to ensure that a permit would be issued.  Further, as to the need to avoid litigation, Bell, Boyd & Lloyd advised only that litigation would not be successful without construction having commenced and that such litigation could jeopardize the project by deterring potential investors.  With regard to opposition from community members, the trial court was apparently referring to a passage in the letter which states that, where there is such opposition to a project, the Department of Planning "staff becomes very inflexible, and the alderman usually follows that lead."  Read in the context of the entire letter, however, this passage is somewhat ambiguous.  It appears to warn Draper that, if LSA does not take the steps necessary to develop the property before the expiration of RPD 196, it will not be able to get approval for the project again.  Further, even if the letter is interpreted as a warning of the potential harm which could be caused by opposition from members of the community, that fact would not support the conclusion that, from the very outset, LSA could not rely in good faith on the probability that a zoning certificate or a building permit would issue.  The letter from Bell, Boyd & Lloyd is dated February 20, 1996.  There is no evidence that LSA was aware at that time of any actual opposition from community members to the project.  Neither the City defendants nor the intervenors have cited any authority for the proposition that a property owner aware of the potential that community members might oppose a proposed project, but not aware of any actual opposition, cannot proceed with the project in good faith reliance on the issuance of a zoning certificate and a building permit under the property's current zoning.  See
 
Constantine v. Village of Glen Ellyn
, 217 Ill. App. 3d 4, 25, 575 N.E.2d 1363 (1991)(“The fact that plaintiffs were aware that there was a problem with the neighbors and a question was raised by them with respect to the property does not establish that plaintiffs could not reasonably rely upon the Village’s 1974 ordinance, its earlier statements about the property and that the Village would apply the ordinance properly.")

The evidence reveals that, in early 1996, when Draper began investigating the possibility of developing the property on LSA’s behalf, it knew only that the property was zoned to allow the intended use.  Accordingly, the trial court’s finding that, from the commencement of the project in 1996, LSA could not rely on the probability that a zoning certificate or a building permit would issue is against the manifest weight of the evidence.  We note, however, that, although the trial court found that, "from the very commencement of this project in 1996," LSA could not rely in good faith on the probability that a zoning certificate and a building permit would issue pursuant to RPD 196, the majority of the facts upon which it based this conclusion occurred not in 1996, but later.  Most significantly, LSA's communications with Bernardini did not begin until the spring of 1997.  The question we must now consider is whether the evidence presented at trial establishes that there came a time, prior to the actual introduction of the down-zoning ordinance, when LSA could no longer rely in good faith on the probability that it would obtain a zoning certificate and a building permit pursuant to RPD 196 and, if so, whether LSA had by that time incurred expenses substantial enough to give rise to a vested right to the issuance of a zoning certificate and a building permit to construct a building allowed under RPD 196.

Before turning to consider the nature of the communications between Bernardini and LSA's agents, we will consider the facts which the trial court found constituted "independent proof" that LSA did not, in fact, believe that a zoning certificate and a building permit were likely to issue pursuant to RPD 196.  First, the trial court noted that LSA, through Draper, hired Guthman, whom it described as “the most politically connected zoning lawyer in Chicago.”  We cannot agree that the mere fact that LSA hired an attorney, "politically connected" or not, to help it navigate the process of obtaining a zoning certificate and a building permit suggests that it did not believe those items would be issued.  The trial court further stated that LSA failed to authorize the architect to proceed beyond the conceptual drawing stage.  This is simply not true.  The evidence established that, on July 28, 1997, Draper authorized SCB to begin preparing the more detailed plans needed for the Part II Submittal, which was part of the schematic stage.  We find no significance to the fact that Draper had not yet authorized SCB to proceed with work necessary for the building permit application prior to its receipt of a Part II Approval.  The court further noted that LSA never obtained financing for the project and did not seek the approval of 60% of its partners, as required under its partnership agreement to construct the proposed high-rise building, until after this litigation commenced.  There was testimony, however, that, due to LSA’s significant assets, financing was not a concern and that partnership approval was not needed until LSA was ready to commence construction.  Finally, the trial court noted that LSA and Draper never formed a proposed partnership for development of the property and that the Part II Submittal was not filed until December 11, 1997.  We fail to see, however, how either of these facts suggests that Draper and LSA did not believe that a zoning certificate and a building permit would be issued.

In further support of its conclusion that LSA could not rely in good faith on the issuance of a zoning certificate or a building permit, the trial court noted that, during the summer of 1997, Bennett and VanSenus learned that community members were posing significant opposition to a building which another developer proposed to build at Stone and Goethe, near LSA's property.  However, we agree with LSA that its knowledge of public opposition to a different construction project is irrelevant to the question of whether it could rely on the issuance of a zoning certificate and a building permit for its own project.

In concluding that LSA did not rely in good faith on the issuance of a zoning certificate and a building permit pursuant to RPD 196, the trial court also noted that, in the late summer or early fall of 1997, Draper instructed SCB to stop work on the architectural plans.  VanSenus, however, testified that work was only stopped for a short period of time while a search was conducted for an equity partner and that other aspects of work on the project continued during this time period.  We cannot agree with the trial court that this temporary halting of a portion of the work being done on the project evidences a belief on LSA's part that it would not obtain a zoning certificate and a building permit. 

Having concluded that none of the above-stated facts and circumstances upon which the trial court relied support its conclusion that LSA could not rely in good faith on the issuance of a zoning certificate and a building permit pursuant to RPD 196, we now turn to consider the final factor upon which the court based its ultimate conclusion; namely, the nature of the communications between Bernardini and representatives of Draper.  As stated earlier, the trial court noted that there was conflicting testimony as to when Bernardini first used the term "down-zoning," but concluded that "an exact rendition of the conversations in April, 1997, and thereafter, is less important than the meaning conveyed at those early encounters."  The trial court further found that:

"Based on all the testimony, it is clear that the message from the Alderman was that a compromise was necessary to prevent adverse consequences.  The person receiving the message from the Alderman was arguably the most sophisticated and experienced zoning attorney in the city of Chicago.  He certainly did not need the message to be more explicit for the meaning to be conveyed."

The evidence at trial establishes that, in April or May 1997, representatives of Draper met with Bernardini and showed him proposed plans for the project.  Bernardini acknowledged that he did not mention down-zoning at that meeting.  He testified, however, that he told Draper's representatives that the proposed building "would be controversial" due to its size and density and that, if they wanted his support, they would need to meet with the neighborhood organizations and reach an agreement.  The trial court found that Bernardini made it clear "that a compromise was necessary to prevent adverse consequences."  We are unsure what the trial court meant by "adverse consequences."  What we do know is that, at the first meeting between Bernardini and Draper representatives, the alderman stated only that Draper must reach an agreement with members of neighborhood organizations if it wanted his support.  We cannot agree with the trial court's implicit finding that Draper should have understood this to mean that Bernardini would introduce a down-zoning ordinance if such an agreement was not reached.  Bernardini stated only that he would not support the project if Draper did not reach an agreement with members of the neighborhood organizations.  He gave no indication that he would actively oppose the project, such as by introducing a down-zoning ordinance.  Thus, we find that, following the first meeting in the spring of 1997, LSA was not on notice that Bernardini would probably introduce a down-zoning ordinance or that it could no longer rely in good faith on the probability that a zoning certificate and a building permit would issue pursuant to RPD 196.

The evidence as to the communications which took place between Bernardini and representatives of Draper after this first meeting is conflicting.  Guthman testified that his next meeting with Bernardini regarding the project took place on August 1, 1997.  According to Guthman, at that time, Bernardini stated that some residents had asked him to down-zone the property.   Bernardini, on the other hand, testified that the first conversation in which he mentioned down-zoning to Guthman took place "shortly after" the initial meeting, which he stated took place in late-April or early-May, and not as late as August 1, 1997.  Bernardini stated that he told Guthman that he was getting more complaints about the project, that he had been asked to down-zone the property, that doing so "was certainly a consideration if they weren't able to reach a compromise" and that he hoped that a compromise could be reached so that he would not have to do so.   Further, while Bernardini testified that he made it clear to Guthman from very early on that the property would be down-zoned if a compromise could not be reached, Guthman stated that the first time Bernardini mentioned down-zoning he did not express an intention to actually introduce a down-zoning ordinance but, rather, asked Guthman whether it would be possible to reduce the density of the building as that seemed to be the primary complaint.  According to Guthman, during a conversation he had with Bernardini on October 22, 1997, the alderman expressed an increased sense of urgency regarding the need for Draper to reach a compromise with community members and held out the introduction of a down-zoning ordinance as a threat to cause Draper to negotiate.  There is no dispute that, on November 17, 1997, Bernardini, at the request of several members of a community organization, agreed to introduce a down-zoning ordinance.  At oral argument, counsel for LSA conceded that, as of that date, LSA was on notice that it was probable that Bernardini would actually introduce the ordinance.  The question on which the ultimate outcome of this case depends, however, is whether, at some point after the first meeting between Bernardini and Draper representatives but prior to November 17, 1997, LSA knew or should have known that it was probable, rather than merely possible, that Bernardini would introduce a down-zoning ordinance and that, accordingly, it could no longer rely on the probability that a zoning certificate and a building permit would issue pursuant to RPD 196.  We believe that the answer to this question involves credibility determinations and factual findings which the trial court has yet to make and which would be inappropriate for initial determination by this court.  Accordingly, we find it necessary to remand this matter to the trial court with directions that it make a factual finding as to the date on which LSA knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance and, thus, that it could no longer rely in good faith on the probability that a zoning certificate and a building permit would issue pursuant to RPD 196.  The trial court must also then make factual determinations as to the amount of expenses that LSA incurred in connection with the project up to that date and whether those expenses are substantial enough to give rise to a vested right to the issuance of a zoning certificate and a building permit pursuant to RPD 196.

For the foregoing reasons, we affirm the portion of the trial court's order entering judgment in part in favor of the City defendants and intervenors on count I of LSA's third amended complaint by denying LSA's request for an order requiring the Zoning Administrator, upon receiving the Part II Approval, to issue a zoning certificate.  Further, we reverse those portions of the trial court's order: (1) denying LSA's request for an order enjoining the City and its agents from applying any provision of the Chicago Zoning Ordinance which will prevent it from developing the property in accordance with the terms of RPD 196; and (2) granting the intervenors' motion for a declaratory judgment that LSA is not entitled to a zoning certificate or a building permit pursuant to RPD 196.  Finally, we remand this cause to the circuit court with directions that it: (1) make a factual finding as to the date on which LSA knew or should have known that it was probable Bernardini would introduce a down-zoning ordinance; (2) determine the total amount of the expenses which LSA had incurred in connection with the project as of that date; (3) determine whether those expenses are substantial enough to give rise to a vested right to the issuance of a zoning certificate and a building permit pursuant to RPD 196; and (4) conduct further proceedings consistent with this opinion

Affirmed in part; reversed in part; and remanded with directions.

SOUTH, P.J., and HALL, J., concur.

FOOTNOTES
1:  
The City, however, made it clear that it was not waiving the requirement that LSA actually apply for a building permit and meet all requirements other than complying with applicable zoning ordinances.

2: 
No witness could state with certainty the month in which this meeting took place.  Additionally, some witnesses testified there were others present at the meeting.